**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TRAVIS DORVIT, Derivatively on Behalf of Nominal Defendant POWER SOLUTIONS INTERNATIONAL, INC., | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| GARY S. WINEMASTER, KENNETH WINEMASTER, ERIC A. COHEN, DANIEL P. GOREY, JAY HANSEN, ELLEN R. HOFFING, KENNETH LANDINI, MICHAEL P. LEWIS AND MARY VOGT, | ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| POWER SOLUTIONS INTERNATIONAL, INC., | ) ) |
| | ) |
| Nominal Defendant. | ) |
| | ) ) ) ) |

Case No. _____

**DEMAND FOR JURY TRIAL**

<u>**VERIFIED DERIVATIVE COMPLAINT**</u>

Plaintiff Travis Dorvit ("Plaintiff"), by his undersigned attorneys, submits this Verified Derivative Complaint against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

<u>**NATURE AND SUMMARY OF THE ACTION**</u>

1.      Plaintiff brings this action derivatively for the benefit of nominal defendant Power Solutions International, Inc. ("PSI" or the "Company") against certain of its current and former

executive officers and directors (collectively, the "Individual Defendants") seeking to remedy the Individual Defendants' breaches of fiduciary duties for willfully ignoring deficiencies in the Company's accounting and financial reporting systems and failing to make a good-faith effort to correct such deficiencies.

2.     As discussed herein, the Individual Defendants were aware of problems with the Company's internal controls and procedures.  Two of the five members of PSI's Board of Directors (the "Board") are longtime Company insiders, and two joined the Board immediately following a 2011 "reverse merger"[1] utilized to take the Company public at a time when the Company disclosed that its internal audit and control functions were essentially being built from scratch.  Despite these red flags, the Individual Defendants knowingly caused and allowed the Company to assure stockholders that PSI's accounting and internal controls were effective, and that the quarterly and yearly financial statements PSI filed with the Securities and Exchange Commission ("SEC") accurately represented its financial position.

3.     In late 2016 and early 2017 the truth slowly began to emerge.  After several press releases and SEC filings stating that the Company was delaying the release of its second quarter 2016 financial results, on August 15, 2016, PSI filed a Form 8-K disclosing that there was an ongoing review of allegations made by a former employee relating to certain transactions involving revenue recognition.  On January 5, 2017, the Company filed a Form 8-K disclosing that, based on the preliminary results of the review, its financial statements for the second through fourth quarters of 2015, fiscal year 2015 and the first quarter of 2016 should no longer be relied upon and needed to be restated, and that PSI had erroneously recognized at least $18

---

[1] A reverse merger is a back-door maneuver whereby a private company merges into a dormant shell corporation that was registered for the purpose of public trading, thereby avoiding the greater scrutiny it would face in an initial public offering.

million in revenue for 2015, approximately 4.6% of its total revenue for the year. The Form 8-K also disclosed that a material weakness in the Company's internal controls over financial reporting existed during the periods subject to the restatement.

4. Finally, on February 3, 2017, the Company disclosed that a week earlier, its independent auditor RSM US LLP ("RSM") had resigned, stating, *inter alia*, that it could **no longer rely on management's representations**. In addition, the Company disclosed that its financial statements for fiscal year 2014 and the first quarter of 2015 should no longer be relied upon, and its Chief Financial Officer ("CFO"), defendant Michael P. Lewis ("Lewis"), had stepped down.

5. The Individual Defendants' failure to ensure that the Company implemented and maintained adequate accounting practices and internal financial controls constituted a breach of their fiduciary duties owed to PSI. As a result of this breach, the Company has sustained damages, as alleged herein, including, without limitation, the costs of restating its financial statements, responding to an SEC investigation, seeking waivers under and amending its credit agreements, and responding to NASDAQ delisting proceedings.

6. Plaintiff brings this action to recover the damages the Company has sustained as a result of the misconduct alleged herein.

## JURISDICTION AND VENUE

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because nominal defendant PSI is headquartered in this District.   Moreover, a substantial portion of the occurrences complained of herein occurred in this District.   In addition, one or more of the Defendants either reside in, or maintain offices in, this District.

## PARTIES

9.     Plaintiff is a holder of shares of PSI common stock, was a holder of shares of PSI common stock at the time of the wrongdoing alleged herein, and has been a holder of shares of PSI common stock continuously since that time.   Plaintiff is a citizen of the State of South Carolina.

10.     Nominal defendant PSI is a Delaware corporation with its principal executive offices located at 201 Mittel Drive, Wood Dale, Illinois, and therefore is a citizen of Delaware and Illinois.   PSI designs, manufactures, distributes and supports power systems for industrial original equipment manufacturers across a broad range of industries and road-markets, including medium duty fleets, delivery trucks, school buses and garbage trucks.   PSI's common stock trades on NASDAQ under the ticker symbol "PSIX."

11.     Defendant Gary S. Winemaster ("Gary Winemaster") is a co-founder of PSI and has served as its Chief Executive Officer ("CEO"), President and a director since 2001.  Prior to the incorporation of PSI's predecessor in 2001, Gary Winemaster had served as CEO and President of PSI's parent company Power Great Lakes, Inc. ("Power Great Lakes") since 1992. As of March 10, 2016, he owned 36.02% of the Company's outstanding common stock.   Upon information and belief, Gary Winemaster is a citizen of the State of Illinois.

12.     Defendant Kenneth Winemaster ("Kenneth Winemaster") is the brother of Gary Winemaster and has served as PSI's Senior Vice President ("SVP") since 2001.  As of March 10, 2016, Kenneth Winemaster owned 20.28% of the Company's outstanding common stock.

Previously, he served as a director of PSI's predecessor from 2001 to 2011 and secretary from 2001 to 2013. Upon information and belief, Kenneth Winemaster is a citizen of the State of Illinois.

13. Defendant Eric A. Cohen ("Cohen") served as PSI's Chief Operating Officer ("COO") from April 9, 2012 through May 16, 2016. Upon information and belief, defendant Cohen is a citizen of the State of Illinois.

14. Defendant Daniel P. Gorey ("Gorey") served as PSI's CFO from April 2012 through October 19, 2015. Previously, he served as the Company's Senior Vice President of Finance from July 2011 through March 2012. Upon information and belief, defendant Gorey is a citizen of the State of Illinois.

15. Defendant Jay Hansen ("Hansen") has served as a director of PSI since October 26, 2011. He has served as a member of the Board's Audit Committee since the Audit Committee was formed in January 2012, and as the Audit Committee's Chairman since mid-2013. He is the co-founder, President and Managing Partner of O2 Investment Partners, LLC, a private equity investment group focusing on small and middle market manufacturing, niche distribution, select services and technology businesses. Previously, defendant Hansen was a consultant in the financial and manufacturing industries, and served as Vice President, Chief Financial Officer and COO of Noble International, Ltd., a supplier of automotive parts, component assemblies and services in the automotive industry. He has served as a director, Chairman of the Audit Committee, and member of the Compliance and Risk Committee of Flagstar Bancorp. According to the Company's public filings, defendant Hansen has "significant knowledge of [PSI's] industry and relevant business and financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our

accounting and financial reporting processes and the auditing of our financial statements." Upon information and belief, defendant Hansen is a citizen of the State of Michigan.

16.     Defendant Ellen R. Hoffing ("Hoffing") has served as a director of PSI since September 18, 2015 and as a member of the Board's Audit Committee since she joined the Board. Defendant Hoffing served as COO and Co-President of Neos Therapeutics, a specialty pharmaceutical company, from September 2009 to April 2014. She previously served as President and CEO of Applied NeuroSolutions, Inc., a development stage biopharmaceutical company. Defendant Hoffing has served as a director of Perrigo Company plc, a global healthcare provider, since July 2008 and currently serves on its audit committee. According to the Company's public filings, defendant Hoffing has "relevant business experience, and [ ] financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements." Upon information and belief, defendant Hoffing is a citizen of the State of Illinois.

17.     Defendant Kenneth Landini ("Landini") has served as a director of PSI since 2001 and, according to the Company's public filings, has "assisted in the development and growth of the business of our company since 1985." Defendant Landini previously served as Vice President of Finance for Power Great Lakes and "assisted us in establishing distributor relationships and expanding the territories into which we provide our power systems." Following the reverse merger that took the Company public in 2011, both Gary and Kenneth Winemaster gave Landini "gifts" of Company preferred stock. Although he is admittedly not independent according to the Company's public filings, defendant Landini served as Chairman of the Board's Audit Committee from the Audit Committee's formation in January 2012 until

mid-2013, and currently serves as the Board's "Lead Outside Director." Landini is a partner and co-founder of Landini, Reed & Dawson, P.C., a certified public accounting and consulting firm in southeastern Michigan, which provides tax advice and consultation services to the Company. Upon information and belief, defendant Landini is a citizen of the State of Michigan.

18. Defendant Lewis had served as CFO of the Company since October 19, 2015, and had assumed the operational responsibilities of former COO defendant Cohen since his departure from the Company in May 2016. Previously he served as Vice President, Finance and CFO ofNorth American Operations of Benteler Automotive beginning in 2013. On February 1, 2017, after RSM announced it could no longer rely upon management's representations, defendant Lewis agreed to take a leave of absence from the Company and relinquish his duties until further notice. Also on February 1, 2017, defendant Lewis submitted a letter of his intent to resign from the Company as of March 4, 2017. From 2010 to 2012, defendant Lewis served as Vice President, Treasurer and director of Investor Relations of Visteon Corporation, and previously served in various roles at Visteon Corporation since 2000. Upon information and belief, defendant Lewis is a citizen of the State of Illinois.

19. Defendant Mary E. Vogt ("Vogt") has served as a director of PSI since 2011 and as a member of the Board's Audit Committee since the Audit Committee's formation in January 2012. She has served as the President of Home Access Health Corporation since 2008 and previously was its CFO. From 1999 to 2003, defendant Vogt was a consultant to businesses in the manufacturing and e-commerce industries. From 1995 to 1998 she was the worldwide director of internal audit for the Leo Burnett Company, an advertising and marketing firm. According to the Company's public filings, Vogt has "relevant business experience as well as [ ] financial expertise, which is important as our Board exercises its oversight responsibility

regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements." Upon information and belief, defendant Vogt is a citizen of the State of Illinois.

20. Defendants Gary Winemaster, Kenneth Winemaster, Cohen, Gorey, Hansen, Hoffing, Landini, Lewis and Vogt are referred to collectively herein as the "Individual Defendants." The Individual Defendants and PSI are referred to collectively herein as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

22. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

(b)    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

(c)    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

(d)    exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading.

23.    The Individual Defendants, as well as all employees, directors and officers of the Company, were and are required to comply with the Power Solutions International, Inc. Code of Business Conduct and Ethics (the "Code of Conduct"). The purpose of the Code of Conduct is, *inter alia*, to "ensure that all of the Company's directors, officers and employees observe the highest standards of ethics in the conduct of the Company's business, avoiding even the appearance of impropriety."

24.    The Code of Conduct provides that:

It is the responsibility of every officer, employee and director, and the policy of the Company to encourage its officers, employees and directors, to ask questions, seek guidance, and report in good faith (a) any questionable accounting, financial, or auditing matters, including, without limitation, any (i) fraud, deliberate error or misrepresentations in the preparation, evaluation, review or audit of any financial statements of the Company, (ii) fraud, deliberate error or misrepresentation in the recording and maintaining of financial records of the Company, (iii) noncompliance with the Company's internal accounting controls, or (iv) misrepresentation or false statements to or by a senior officer or accountant of the Company regarding a matter contained in the Company's financial records, financial reports or audit reports, or (b) any known or possible violations of this Code, other Company policies or compliance programs, or applicable law.

25.     Defendants Gary Winemaster, Gorey and Lewis, as CEO, former CFO and current CFO, respectively, are also subject to the Power Solutions International, Inc. Code of Ethics for Principal and Senior Financial Officers (the "Financial Officer Code of Conduct"), which states that the Company "strives to maintain the highest standards of accuracy, completeness and integrity in its financial dealings, records and reports."

26.     The Financial Officer Code of Conduct mandates that defendants Gary Winemaster, Gorey and Lewis comply with the following:

1.      Honest and Ethical Conduct

The Senior Officers will exhibit and promote honest and ethical conduct by:

◦ Encouraging and rewarding professional integrity and eliminating barriers to responsible behavior.

◦ Promoting the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

◦ Respecting the confidentiality of information acquired in the course of work, except when authorized or otherwise legally obligated to disclose such information.

◦ Periodically communicating these ethical standards throughout the organization.

2.      Financial Records and Periodic Reports

The Senior Officers will establish and manage the enterprise transaction and reporting systems and procedures to provide that:

◦ Business transactions are properly authorized and accurately and timely recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles (GAAP) and policies established by the Company.

◦ False or artificial statements are not made in the Company's books and records, financial statements or related communications.

◦ The retention or proper disposal of Company records shall be in accordance with applicable legal and regulatory requirements and any records retention policies established by the Company.

◦ Reports and documents filed by the Company with, or submitted by the Company to, the Securities and Exchange Commission, as well as other public communications made by the Company, will include full, fair, accurate, timely and understandable disclosure.

3.      Compliance with Applicable Laws, Rules and Regulations

The Senior Officers will establish mechanisms to:

◦ Educate Company employees about applicable governmental laws, rules and regulations.

◦ Monitor compliance with applicable governmental laws, rules and regulations.

27.     Defendants Gary Winemaster, Gorey and Lewis were and are also required to promptly bring certain matters to the attention of the Audit Committee, including:

◦ Material information that calls into question disclosures made by the Company in its filings with, or submissions to, the Securities and Exchange Commission or in other public communications.

◦ Information concerning significant deficiencies or material weaknesses in the design or operation of the Company's "internal control over financial reporting" (as defined in Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended) or other factors that could adversely affect the Company's ability to record, process, summarize and report financial data on a timely basis.

◦ Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

◦ Information concerning a violation of this Code or any other Company conduct codes, including any actual or apparent conflicts of interest between personal and professional relationships, involving management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

◦ Evidence of a material violation of applicable governmental laws, rules or regulations by the Company or its employees or agents.

28.     In addition to their duties as Board members, defendants Hansen, Hoffing and Vogt had certain duties by virtue of their positions on the Audit Committee. These duties are set forth in the Audit Committee Charter.

29.     According to the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board "in overseeing (1) the integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements; (3) the qualifications and independence of the registered public accounting firm that audits the Company's financial statements (the "Auditors"); (4) the performance of the Auditors and of the Company's internal audit function (if applicable); and (5) the Company's internal accounting and financial reporting controls."

30.     The Audit Committee is tasked with appointing, monitoring the performance and independence of, and approving services of the Company's independent auditors. In addition, the Audit Committee is required to:

> (d) Audit Plan and Conduct. The Committee shall review with the Auditors and management (including the Company's chief financial officer and principal accounting officer) the audit plan of the Auditors, including the scope of their audit and general audit approach. The Committee shall discuss with the Auditors the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, and Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1 AU Section 380), as adopted by the PCAOB in Rule 3200T, which matters include the Auditors' responsibilities under generally accepted auditing standards, significant accounting policies, the process used by management in formulating accounting estimates and the basis for the Auditors' conclusions regarding the reasonableness of these estimates, significant audit adjustments, the Auditors' responsibilities for other information in documents containing audited financial statements, any procedures performed and the results thereof, disagreements with management, significant matters that were the subject of management's consultation with other accountants, major issues that were discussed with management in connection

with the initial or recurring retention of the Auditors, and difficulties encountered by the Auditors in dealing with management related to the performance of its audit.

(e) Establishment of Internal Audit Function. If not already established, the Committee shall periodically evaluate whether the Company should establish an internal audit function (with Company personnel and/or on an outsourced basis), and if the Committee determines that an internal audit function should be established, the Committee shall oversee that the Company takes such steps with respect to the establishment of such function as deemed appropriate by the Committee. The Committee may decide to outsource all or part of such internal audit function. The director of the internal audit function (if any) shall report directly to the Committee, and shall also report to the Company's chief financial officer for administrative purposes. If an internal audit function is established, the Committee shall periodically (1) review with the Company's management, as well as the persons performing the Company's internal audit function, the plans, activities, staff, organizational structure and effectiveness of the internal audit function, and (2) review findings and recommendations from completed internal audits.

(f) Review of Auditor Report. The Committee shall obtain and review a report from the Auditors at least annually as to (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management, including the ramifications of such alternative disclosures and treatments and the treatment preferred by the Auditors, and (3) any other material written communications between the Auditors and management, including management letters and schedules of unadjusted audit differences.

(g) Confirmation Regarding Illegal Acts. Promptly after the completion of each audit of the Company conducted by the Auditors, the Committee shall obtain from the Auditors confirmation that the Auditors have not detected or otherwise become aware of information indicating that an illegal act has or may have occurred, pursuant to Section 10A(b) of the Exchange Act.

(h) Committee Meetings with Auditors. The Committee shall conduct meetings with the Auditors, without management present, to discuss candidly any audit problems or difficulties and management's responses to the Auditors' efforts to resolve such problems.

31.     The Audit Committee is also tasked with oversight of the Company's internal controls and compliance.  Specifically, this includes:

(a)  Review of Internal Controls and Accounting/Financial Resources. The Committee shall review and discuss with the Auditors, financial and accounting personnel and the internal auditors (if applicable) (i) the quality and depth of staffing in, and resources of, the Company's accounting, information services and financial departments, as needed, and (ii) the adequacy of the Company's internal control over financial reporting and disclosure controls and procedures, including controls and security procedures with respect to the Company's information systems and the Company's process for assessing risk of fraudulent financial reporting and detecting major control weaknesses, and any related significant findings and recommendations of the Auditors and the internal auditors (if applicable) (e.g., regarding deficiencies, significant deficiencies or material weaknesses), together with management's responses thereto, and the adequacy of disclosures about changes in internal control over financial reporting. The Committee shall also review with the Auditors, the internal auditors (if applicable) and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

(b) Management's Internal Controls Report. The Committee shall review and discuss with the Auditors and management the report of management on the Company's internal control over financial reporting to be included when required in the Company's Annual Report on Form 10-K prior to filing such Annual Report on Form 10-K with the SEC.

(c)  Submission of Complaints. The Committee shall establish procedures for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, (2) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters, and (3) the dissemination of the procedures developed pursuant to clause (2) above in a manner reasonably calculated to make them known to all Company employees. The Committee shall monitor and promote the Company's adherence to these procedures.

(d) Financial Risk Exposure and General Compliance. The Committee shall discuss and review with management the Company's major financial risk exposure and the steps management takes to implement plans to monitor and mitigate

such risks, including risk assessment and management policies. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Company, any published reports that raise material issues regarding the Company's financial statements or accounting policies, tax matters, legal and regulatory compliance and correspondence between the Company and any regulatory or governmental authorities, and matters that could materially impact the Company's internal control over financial reporting, disclosure controls and procedures and financial reporting. The Committee shall review the Company's procedures for monitoring compliance with laws and regulations; as well as the Company's code of conduct and other policies relating to compliance with laws and regulations, throughout the Company.

(e) Debt Instruments. The Committee shall review and discuss with the Auditors and management the Company's compliance with financial covenants in its credit facility and other material outstanding debt instruments, as well as any material debt instruments issued by any of the Company's subsidiaries.

(f) Related Party Transactions and Conflicts of Interest. The Committee shall review and approve (or deny) related party transactions and resolve conflicts of interest questions involving Board members or management and review, and monitor compliance with, any written policies of the Company regarding related party transactions or conflicts of interest.

32.     With respect to PSI's financial reporting, the Audit Committee's duties are as follows:

(a) Financial Statement Review. The Committee shall review and discuss with management and the Auditors the Company's annual audited and quarterly unaudited financial statements, including the Auditors' audit reports and the results of the Auditors' review of the quarterly financial statements (as applicable), as well as the related "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case prior to filing the financial statements with the SEC. The Committee shall recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K filed with the SEC. The Committee shall also authorize the filing by the Company of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q containing the Company's financial statements.

(b) Earnings Release Review. Prior to their release, the Committee shall review all of the Company's earnings releases.

(c) Disclosure Principles and Practices. The Committee shall discuss with the Auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments. The Committee shall discuss with the Auditors and management the effect of regulatory and accounting initiatives, as well as any off-balance sheet structures, on the Company's financial statements.

(d) Fraud Certification Disclosures. The Committee shall review and discuss disclosures made to the Committee by the Company's chief executive officer and chief financial officer during the certification process for the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q about the effectiveness of the Company's disclosure controls and procedures, any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees having a significant role in the Company's internal control over financial reporting.

(e) Audit Committee Report. Based upon discussions with, and reliance upon, the Auditors and management, the Committee shall annually review and approve the report required by SEC rules to be included in the Company's annual proxy statement. In addition, the Committee will review any other audit committee-related disclosure in the Company's filings with the SEC or otherwise as required by applicable securities laws, rules and regulations or, if the Company's securities have become listed on a national securities exchange, by the rules of such exchange.

33.     In addition, defendants Hansen, Hoffing and Vogt, as members of the Audit Committee, are "responsible for recommending appropriate disciplinary and/or remedial actions" in the event of a violation of the Financial Officer Code of Conduct.

34.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

## SUBSTANTIVE ALLEGATIONS

### Background of PSI

35.     PSI designs, manufactures, distributes and supports power systems for industrial original equipment manufacturers across a broad range of industries and road-markets, including medium duty fleets, delivery trucks, school buses and garbage trucks.  Its primary facilities are located in Illinois, Wisconsin and Michigan.

36.     The Company is controlled by brothers Gary Winemaster and Kenneth Winemaster, who collectively own 56.3% of PSI's outstanding common stock.  Their father, William Winemaster, is also a company employee who performs "consulting and advisory type services" and collects a salary of over $150,000 per year, plus automobile and mobile telephone allowances.

37.     The Company's predecessor was founded in 1985.  On April 29, 2011, The W Group, Inc. ("W Group") completed a reverse merger transaction with Format, Inc. ("Format"), a Nevada corporation that had nominal operations and assets.  As a result of the reverse merger, Format became PSI, and PSI succeeded to the business of the W Group.  In August 2011, PSI merged into its subsidiary with the same name incorporated in Delaware, thereby becoming a Delaware corporation.

38.     The Individual Defendants have long been on notice of problems with the Company's accounting and internal controls.  Indeed, the Company did not even have an Audit Committee until January 2012.  When the Audit Committee was finally formed, it consisted of defendants Hansen, Landini and Vogt.  Despite the fact that he was admittedly not independent, defendant Landini was not only a member of the Audit Committee but also its Chairman.

39.     In the Company's Form 10-K for fiscal year 2011 filed with the SEC on March 30, 2012 (the "2011 10-K"), Defendants disclosed that prior to the reverse merger, the W Group

was a private company and therefore was not subject to public company reporting obligations. As a result, it had little, if any, accounting and internal controls. As the 2011 10-K stated:

> [W]e have had to, and we currently continue to, enhance and supplement our internal accounting resources with additional accounting and finance personnel with the requisite technical and public company experience and expertise, and more generally strengthen our disclosure controls and procedures and our internal control over financial reporting to enable us to accurately and timely prepare our consolidated financial statements and otherwise satisfy these reporting obligations. In particular, in June 2011, we established a disclosure and compliance committee (the "Disclosure Committee"), consisting of senior members of our finance and accounting department and other members of senior management, and adopted disclosure and compliance committee guidelines. . . During the fiscal year ended December 31, 2011, we also retained additional staff in our finance and accounting department, and on July 18, 2011 we hired an additional senior financial professional with prior public company experience, thereby further strengthening the overall capabilities of our finance and accounting department. In August 2011, we created an internal accounting department and hired an internal audit manager with prior experience implementing and evaluating our compliance with Sarbanes-Oxley Act of 2002.

40.     At the time of the 2011 10-K, the Company had not yet performed an annual assessment of the effectiveness of its internal control over financial reporting pursuant to Sarbanes-Oxley, but it intended to do so at the end of fiscal year 2012.

41.     Not surprisingly, when such an assessment was performed, material weaknesses in the Company's internal and financial controls were discovered, and the assessment concluded that as of December 31, 2012, the Company's internal control over financial reporting was not effective. Specifically, according to the Company's Form 10-K for fiscal year 2012, filed with the SEC on March 12, 2013 (the "2012 10-K"), controls over the business system software used in PSI's aftermarket parts group were not adequate, as (i) all users of the software had access to add, delete or modify any data; (ii) there were no controls in place to adequately monitor transactions within the software; and (iii) the software users were not assigned detailed security

rights, and users gained access to system modules through use of passwords that were not periodically changed to ensure that only appropriate individuals had access to each module.

42.     The 2012 10-K also indicated that the Company's internal controls needed improvement generally, stating "under the direction of the Audit Committee, management will continue to review and make necessary changes to the overall design of our internal control environment to improve internal controls over financial reporting."

43.     The material weaknesses described in the 2012 10-K were not fully (purportedly) remediated until a full year later.  After disclosing in the first, second and third quarter 2013 financial statements that the Company's internal controls still were not effective, the Company's Form 10-K for fiscal year 2013 stated that previously identified material weaknesses had been remediated and that the Company's internal controls were effective.

44.     Thereafter, including throughout fiscal year 2015 and the first quarter of 2016, Defendants assured PSI's stockholders that the Company's internal controls and procedures were adequate and effective, when in reality they knew this was not the case.

**Defendants Slowly Reveal That the Company Did Not
Maintain Adequate Internal Controls**

45.     On August 4, 2016, PSI postponed its second quarter earnings release and conference call, which were originally scheduled for that day, in order to "allow for more time to finalize its quarterly financial results."

46.     Thereafter, on August 10, 2016, PSI announced that it would be filing a notice of late filing for its second quarter Form 10-Q and would no longer participate in the Jeffries 12th Annual Industrials Conference being held on August 11, 2016.  Later that day, the Company filed a Form 12b-25 stating that the Company needed "additional time to complete its financial

statements" because it had "not concluded its review and analysis of transactions necessary for the closing of its books for the quarter."

47.     Finally, on August 15, 2016, the Company admitted the reason for the delays in a Form 8-K and press release, which stated that:

> The Company has not completed its financial statements in light of an ongoing review of allegations made by a former employee. The Board and the Company take all allegations that concern its financial reporting seriously and initiated an independent review to assess whether there is any merit to them. The review is primarily focused on certain transactions involving revenue recognition. The Audit Committee and the professionals engaged by it to conduct the independent review are working diligently with management to conclude this review in a timely manner. Once the independent review is complete, the Company will announce its findings and subsequently release its results for the quarter.

48.     On August 18, 2016, Defendants assured stockholders that the review was proceeding with diligence, and on August 26, 2016, Defendants stated that PSI expected to file its third quarter Form 10-Q in November, *i.e.*, on time.

49.     However, on November 10, 2016, PSI filed another Form 12b-25 stating that the third quarter Form 10-Q would not be filed on time, because the internal review was not yet complete.

50.     Finally, on January 5, 2017, the Company disclosed that on December 28, 2016, the Audit Committee, which had been overseeing the independent internal review of the Company's financial statements, had reached preliminary findings, and that management, in consultation with the Audit Committee and Board, had determined that PSI's financial statements for the second through fourth quarters of 2015, fiscal year 2015, and the first quarter of 2016 should no longer be relied upon and would need to be restated.

51.     The Form 8-K disclosed that the restatements will focus on the timing of revenue recognition in accordance with GAAP and is expected to result in restating certain revenues,

expenses and related balance sheet accounts as reported in prior periods. The Company further disclosed that the adjustments will reduce net sales recognized in the second, third and fourth quarters of 2015. While the Company stated it was unable as of the filing of the Form 8-K to quantify definitively the impact of the adjustments on the prior financial statements, the errors identified based on transactions reviewed to date include at least $18 million in revenue erroneously recognized in the Company's 2015 financial statements. The Company was unable to provide assurance that additional errors would not be identified or impact prior accounting periods.

52.     The Form 8-K also disclosed that a material weakness in the Company's internal controls over financial reporting existed during the periods subject to the restatement.

53.     Then, on February 3, 2017, the Company filed a Form 8-K disclosing that on January 27, 2017, RSM had resigned as PSI's independent auditor. RSM communicated that it had identified several "reportable events" concerning the Company's financial reporting based on the information provided to RSM by the Audit Committee in connection with its "ongoing independent investigation," including that "(i) there are material weaknesses in the Company's internal control over revenue recognition and, more broadly, in its overall control environment and (ii) *RSM can no longer rely on management representations*." (Emphasis added).

54.     In addition, RSM recalled its previously issued audit reports for fiscal years 2014 and 2015, and stated that its 2014 audit report and interim review of the first quarter of 2015 could no longer be relied upon. Accordingly, PSI stated that its previously issued financial statements for fiscal year 2014 and the first quarter of 2015 could no longer be relied upon and management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting should no longer be relied upon.

55.     The Company also disclosed that on February 1, 2017, defendant Lewis agreed to take a leave of absence and relinquish his duties until further notice.   In addition, Lewis submitted a letter to the Company noticing his intent to resign from the Company effective March 4, 2017, purportedly for "good reasons" under his employment agreement.

### The Individual Defendants' False and Misleading Statements

56.     The Individual Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and its financial status from at least February 26, 2015 to May 10, 2016.   In particular, the Individual Defendants knowingly caused or allowed the Company to:

> (a)     repeatedly assure stockholders that the Company's internal controls were adequate and effective, when the Individual Defendants knew that was not true; and
>
> (b)     report quarterly and annual financial results the Individual Defendants knew were materially inaccurate as a result of the Company's accounting improprieties.

57.     The Individual Defendants knowingly caused or allowed the Company to issue the foregoing false and misleading statements in press releases, Form 10-Qs, Form 10-Ks and other SEC filings, conference calls and investor presentations from at least February 26, 2015 through May 10, 2016, including, without limitation, the following:

> (a)     February 26, 2015 press release;
>
> (b)     February 26, 2015 conference call;
>
> (c)     March 13, 2015 Form 10-K, which was signed by defendants Gary Winemaster, Gorey, Hansen, Landini and Vogt and certified by defendants Gary Winemaster and Gorey;
>
> (d)     May 7, 2015 press release;
>
> (e)     May 7, 2015 conference call;
>
> (f)     May 8, 2015 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(g)     August 5, 2015 press release;

(h)     August 5, 2015 conference call;

(i)     August 7, 2015 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(j)     October 28, 2015 press release;

(k)     November 9, 2015 press release;

(l)     November 9, 2015 conference call;

(m)     November 9, 2015 Form 10-Q, which was signed by defendant Lewis and certified by defendant Gary Winemaster and Lewis;

(n)     February 22, 2016 press release;

(o)     February 22, 2016 conference call;

(p)     February 26, 2016 Form 10-K, which was signed by defendants Gary Winesmaster, Hansen, Hoffing, Landini, Lewis and Vogt and certified by defendants Gary Winemaster and Lewis;

(q)     March 11, 2016 press release;

(r)     May 9, 2016 press release;

(s)     May 9, 2016 conference call; and

(t)     May 10, 2016 Form 10-Q, which was signed by defendant Lewis and certified by defendant Gary Winemaster and Lewis.

**The Officer Defendants Received Improper Incentive Compensation Based on the Company's Overstated Financial Results**

58.     Each of defendants Gary Winemaster, Kenneth Winemaster, Cohen and Gorey (together, the "Officer Defendants") received incentive compensation based on the Company's overstated financial results, which constituted unjust enrichment of such defendants.

59.     Specifically, for 2014, the Compensation Committee awarded cash bonuses to the Officer Defendants, based at least in part on the Company's performance, as follows:

(a)     Gary Winemaster received a bonus of $380,000, which comprised approximately 39.1% of his total compensation;

      (b)     Kenneth Winemaster received a bonus of $170,000, which comprised approximately 35.7% of his total compensation;

      (c)     Cohen received a bonus of $100,000, which comprised approximately 16.3% of his total compensation; and

      (d)     Gorey received a bonus of $200,000, which comprised approximately 41.2% of his total compensation.

60.     But for the Company's improperly overstated financial results, the Officer Defendants would not have received the amount of incentive compensation they did for 2014.

### THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY

61.     During the relevant period, the Individual Defendants were well aware of the problems with the Company's internal controls and its deficient accounting and financial reporting practices, procedures, and systems. Through their attendance at Board, Audit Committee and management meetings, their review of the Company's financial statements, and conversations with the Company's management, auditors, and consultants, the Individual Defendants knew PSI lacked adequate accounting and financial reporting systems, yet they declined to implement the necessary systems and expertise.

62.     In breach of their fiduciary duties of loyalty and good faith and enumerated responsibilities under the Code of Conduct, Financial Officer Code of Conduct (with respect to Gary Winemaster, Gorey and Lewis), and Audit Committee Charter (with respect to defendants Hansen, Hoffing and Vogt), the Individual Defendants willfully ignored the deficiencies in the Company's accounting and financial reporting systems and failed to make a good faith effort to address them.

63.     The Individual Defendants further breached their fiduciary duties by knowingly disseminating to the public materially false and misleading statements concerning the Company's financial results and internal controls.

64.     As a direct and proximate result of the misconduct alleged herein, the Company has suffered harm.  Specifically, the Company is now subject to an investigation by the SEC's enforcement staff and has received a subpoena requiring the production of documents and information.

65.     PSI has also received two delinquency notices from NASDAQ and has been forced to submit compliance plans and seek extensions for the filing of its financial statements in order to maintain its listing.  NASDAQ provided PSI with an extension through February 6, 2017, which the Company failed to meet, and therefore has put its continued listing in jeopardy.

66.     In addition, the Company has twice been forced to amend its credit agreements to obtain waivers relating to the allegations made by the unidentified former employee and the delays in filing its second and third quarter Forms 10-Q.  Specifically, on August 22, 2016, the Company and its lenders entered into amendments that require that PSI establish a separate reserve of $12.5 million against its borrowing base ability until the filing of the second quarter Form 10-Q, at which time the reserve amount will be reduced to $7.5 million.  On December 19, 2016, PSI and its lenders entered into second amendments that eliminate the reduction of the reserve to $7.5 million upon the filing of the second quarter Form 10-Q and make the $12.5 million reserve permanent.  The second amendment with one lender also, *inter alia*, increases another specified availability reserve and requires the Company to engage a third party consulting firm to confirm various forecasts and projections for the benefit of the lenders.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

68.     Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

69.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

70.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

71.     The Board currently consists of five directors:  Gary Winemaster, Hansen, Hoffing, Landini and Vogt.  A majority of these directors is incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

72.     As alleged herein, defendants Hansen, Hoffing, Landini and Vogt, as directors; defendant Gary Winemaster, as a director and senior executive officer of the Company; and defendants Hansen, Hoffing and Vogt, as directors and members of the Audit Committee, knowingly caused or allowed the Company to consistently misrepresent its financial results and the adequacy and effectiveness of its internal controls, and deliberately declined to ensure that the Company maintained adequate controls over its internal accounting and financial reporting functions, and therefore they each face a substantial likelihood of being held liable for their misconduct.  Accordingly, there is a reasonable doubt that directors Gary Winemaster, Hansen, Hoffing, Landini and Vogt can disinterestedly consider a demand to institute and vigorously prosecute this action.

73.     Defendant Gary Winemaster is directly interested in the outcome of this action as a recipient of the improperly awarded incentive compensation, as alleged herein. Accordingly, Gary Winemaster cannot disinterestedly and independent consider a demand to institute and vigorously prosecute this action.

74.     Defendant Landini has long been involved with the Company and the Winemasters. Not only was he Vice President of Finance at Power Great Lakes, but according to the Company's public filings, Landini received a "gift" of 295 shares of PSI's preferred stock from each of Gary and Kenneth Winemaster following the reverse merger of the W Group and Format.

75.     Defendant Landini also reaps the benefits of services his CPA and consulting firm, Landini, Reed & Dawson, P.C., provides to the Company. Since 2011, the year in which the reverse merger by which the Company became publicly traded was completed, Landini's firm has been paid a total of over $513,000 for preparation of tax returns, tax "advice" and "consultation services." Landini's firm previously provided similar services to the W Group. Upon information and belief, PSI (and previously the W Group) is an important client of Landini's small firm, which has less than ten employees, and the amounts paid by PSI to the firm are therefore material to Landini.

76.     Furthermore, according to the Company's SEC filings, Gary Winemaster and Landini are admittedly not independent.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties of Loyalty and Good Faith

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

78. Each of the Individual Defendants was a director and/or officer of PSI during the relevant period. Accordingly, each of the Individual Defendants owed the Company the utmost duties of good faith and loyalty.

79. The Individual Defendants breached these fiduciary duties by knowingly failing to ensure that the Company implemented and maintained adequate internal controls over its accounting and financial reporting functions and by knowingly disseminating to stockholders materially false and misleading statements concerning the Company's financial results and internal controls, as alleged herein.

80. By reason of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### Against the Officer Defendants for Unjust Enrichment

81. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

82. Defendants Gary Winemaster, Kenneth Winemaster, Cohen and Gorey received improper incentive compensation based on the Company's overstated financial results, as alleged herein.

83. It would be unconscionable and against the fundamental principles of justice, equity and good conscience for defendants Gary Winemaster, Kenneth Winemaster, Cohen and Gorey to retain the improper incentive compensation they received as a result of the Company's overstated financial results.

84. To remedy the unjust enrichment of defendants Gary Winemaster, Kenneth Winemaster, Cohen and Gorey, the Court should order them to disgorge to the Company all compensation received as a result of the Company's overstated financial results..

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(a)     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

(b)     Compelling the Officer Defendants to disgorge to the Company the improper compensation they received as a result of the Company's overstated financial results;

(c)     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

(d)     Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(e)     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated:  February 10, 2017

**ZIMMERMAN LAW OFFICES, P.C.**

/s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr.
Amelia S. Newton
77 West Washington Street, Suite 1220
Chicago, IL 60602
Tel: (312) 440-0200
Fax: (312) 440-4180

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
Kristen L. Ross
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (267) 948-2512

**ANDREWS & SPRINGER LLC**
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel: (302) 504-4957
Fax: (302) 397-2681

***Counsel for Plaintiff***

## **VERIFICATION**

I, Travis Dorvit, hereby verify that I have authorized the filing of the attached Derivative Complaint, that I have reviewed the Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 2/8/2017

TRAVIS DORVIT