## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| TRAVIS DORVIT and MICHAEL MARTIN, Derivatively on Behalf of Nominal Defendant POWER SOLUTIONS INTERNATIONAL, INC., | ) ) ) )  Case No. 1:17-cv-01097 |
| Plaintiffs, | )  Honorable Thomas M. Durkin |
| v. | ) |
| GARY S. WINEMASTER, KENNETH WINEMASTER, DANIEL P. GOREY, JAY HANSEN, ELLEN R. HOFFING, KENNETH LANDINI, MICHAEL P. LEWIS, MARY VOGT, SHAOJUN SUN, JIANG KUI, JASON LIN, LESLIE A. COOLIDGE, and FRANK P. SIMPKINS, | ) ) ) ) ) ) ) ) |
| Defendants, | ) |
| and | ) |
| POWER SOLUTIONS INTERNATIONAL, INC., | ) ) |
| Nominal Defendant. | )  DEMAND FOR JURY TRIAL |

### VERIFIED SECOND AMENDED STOCKHOLDER DIRECT AND DERIVATIVE COMPLAINT

Plaintiff Travis Dorvit and plaintiff Michael Martin (collectively, "Plaintiffs"), by their undersigned attorneys, submit this Verified Second Amended Stockholder Direct and Derivative Complaint against the defendants named herein, and allege upon personal knowledge with respect to themselves, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and investigation undertaken by Plaintiffs' counsel, as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder direct and derivative action brought for the benefit of nominal defendant Power Solutions International, Inc. ("PSI" or the "Company") against certain of its current and former executive officers and directors (the "Individual Defendants") directly for injunctive relief and derivatively in order to remedy the Individual Defendants' breaches of fiduciary duties, including willfully ignoring deficiencies in the Company's accounting and financial reporting systems and failing to make a good-faith effort to correct such deficiencies.

2.      PSI designs, engineers, manufactures, and distributes emission certified, alternatively-fueled engines and conventional power systems to a host of leading global equipment manufacturers around the world.  PSI was founded as a private company in 1985 by defendant Gary S. Winemaster, the former Chairman of the Company's Board of Directors (the "Board"), President, and Chief Executive Officer ("CEO") from 2011 until his resignation in April 2017.

3.      In April 2011, PSI went public as part of a "reverse merger"[1] transaction, whereby the Company merged into a shell corporation that was already registered for public trading.  The reverse merger allowed PSI to become publicly traded while simultaneously avoiding the increased scrutiny and regulatory requirements it would have faced had the Company gone public by way of a traditional initial public offering.  From the April 2011 reverse merger through March 2017, defendant Gary Winemaster together with his brother and long-time PSI executive and director, defendant Kenneth J. Winemaster, were the Company's majority stockholders, collectively holding more than 50% of PSI's outstanding stock.

---

[1] A reverse merger is a back-door maneuver whereby a private company merges into a dormant shell corporation that was registered for the purpose of public trading, thereby avoiding the greater scrutiny it would face in an initial public offering.

4. During its first year as a public company, PSI disclosed that it was essentially in the process of building its internal controls from scratch in order to meet public company reporting obligations. On March 12, 2013, PSI filed with the U.S. Securities and Exchange Commission ("SEC") its Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (the "2012 Form 10-K"). The 2012 Form 10-K noted that management completed its first annual assessment over financial reporting and concluded that the Company's "disclosure controls and procedures were not effective as a result of a material weakness in [PSI's] internal controls over financial reporting" that "may not prevent or detect misstatements." Nonetheless, the 2012 Form 10-K assured the investing public that management had been "actively engaged in developing and implementing a remediation plan to address the material weakness" which would purportedly "effectively remediate" the problems.

5. Throughout much of the following year, the Company continued to warn that its internal controls were ineffective. Despite these warnings, the Individual Defendants repeatedly touted to stockholders impressive sales and revenue increases, backed by "strong" and "increasing" demand for its products, while also forecasting "significant future growth." As a result, the market reacted highly favorably and the Company's stock price steadily skyrocketed from $16.18 per share at the beginning of 2013 to close the year at $75.10 per share, an increase of more than 464%.

6. On February 28, 2014, the Company boasted for the first time that it had purportedly remediated the previously disclosed material weakness in its internal controls. Specifically, on February 28, 2014, PSI filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (the "2013 Form 10-K"), which proclaimed that management's most recent assessment "concluded that *[PSI's] disclosure controls and*

*procedures were effective*" (an assessment the Individual Defendants would continue to boldly profess for the next two and a half years). The Individual Defendants' rosy financial projections combined with the Company's assurance that it was no longer operating with a material weakness quickly drove PSI's stock price to close at an impressive $84.45 per share on March 10, 2014, the week after the 2013 Form 10-K was filed.

7. The Individual Defendants' long-touted rosy projections first began to unravel on May 7, 2015, when the Company announced strong revenues for the first quarter of 2015, but lowered its outlook for revenue growth in the second quarter. In August 2015, the Company lowered guidance for the third and fourth quarters, and reduced guidance for the full year of 2015. As a result of these and other disappointing earnings announcements through the remainder of 2015 and into early 2016, PSI's stock price steadily dropped from $65.10 per share on May 7, 2015, to just $8.83 per share on February 23, 2016, a decline of *86.4%*.

8. Unfortunately, this was only the tip of the iceberg. In fact, as discussed herein, the Individual Defendants would begin to slowly reveal between August 2016 and February 2017, that PSI had been operating for several years with material weaknesses in its internal controls, had long been improperly recognizing revenue, and would need to restate multiple years' worth of financial statements filed with the SEC and disseminated to the public.

9. The initial hints of these startling revelations first began to trickle out in early August 2016, when PSI cryptically announced that the Company postponed its second quarter earnings release and conference call, and that it needed "additional time to complete its financial statements." By January 2017, the Company was forced to admit that it would need to restate its financial statements for fiscal year 2015, the second, third, and fourth quarters within 2015, and the first quarter of 2016. According to the Company, these financial statements needed to be

restated to "reflect the impact of certain errors involving revenue recognition," and the errors reviewed to date included *at least $18 million* in revenue erroneously recognized in the Company's 2015 consolidated financial statements. PSI further disclosed that it had been *operating with a material weakness in internal controls over financial reporting during each of the above noted periods*, and that the SEC's enforcement staff informed the Company that it was investigating, among other things, PSI's revenue recognition practices.

10. Shortly thereafter, on February 3, 2017, the Company disclosed that a week earlier, its independent auditor RSM US LLP ("RSM") had resigned, stating, *inter alia*, that it could *no longer rely on management's representations*. In addition, PSI disclosed that its financial statements for fiscal year 2014 and the first quarter of 2015 should no longer be relied upon, and its Chief Financial Officer ("CFO"), defendant Michael P. Lewis, had stepped down from the Company.

11. On February 10, 2017, PSI disclosed that it had replaced RSM with a new independent auditor, Frazier & Deeter, LLC ("Frazier"). On April 7, 2017, PSI acknowledged that it would also be forced to restate its fiscal year 2014 and the first quarter of 2015 financials. PSI further estimated that the planned restatement of the Company's previously reported financial statements for fiscal years 2014 through 2016 (the "Restatement") would "result in a shift of recognized revenues from prior periods to subsequent periods in the aggregate amount of approximately $48 million to $74 million." In addition, the announcement revealed that defendant Gary Winemaster resigned as CEO, President, and Chairman of the Board.

12. On June 9, 2017, Eric A. Cohen ("Cohen"), the Company's former Chief Operating Officer ("COO"), filed a whistleblower complaint against PSI in this Court (the "Cohen Complaint"). The Cohen Complaint alleges that Mr. Cohen was improperly terminated

by PSI "in direct response to his reports of the Company's violations of U.S. Generally Accepted Accounting Principles ("GAAP"), [Sarbanes-Oxley Act of 2002 ("SOX")], and federal securities laws and rules prohibiting securities and accounting fraud."  The Cohen Complaint also states that in early 2016, Mr. Cohen repeatedly furnished reports of such wrongdoing to defendant Gary Winemaster, the Company's Board, and the Audit Committee of the Board (among other PSI executives and fiduciaries), but that the Individual Defendants refused to act and instead continued to publicly misrepresent the Company's revenues.  In addition, the Cohen Complaint identifies numerous specific transactions in which PSI improperly recognized revenue over the years, primarily through a "pull-forward" revenue recognition scheme that wrongfully recorded revenue in earlier periods before the criteria for revenue recognition were satisfied, in violation of GAAP, SEC rules, and the Company's own stated revenue recognition policies.

13.     As the Company now admits, ***several years' worth of PSI's SEC filings "should no longer be relied upon"*** due to the variety of misstatements described therein.  PSI has not timely filed and is currently incapable of filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2016.  Additionally, the Company has not filed its Quarterly Reports on Forms 10-Q since May 10, 2016.  Nevertheless, on March 14, 2018, the Company announced that was terminating Frazier, just one year after it retained the firm to audit PSI's financials and oversee the Restatement.  To date, PSI has yet to complete the Restatement or bring its financial statements up to date after RSM resigned.  As a result, the Company has been delisted by the Nasdaq Stock Market ("NASDAQ"), and it is unclear when, if ever, the Restatement will be completed.

14.     The Individual Defendants' faithless actions and repeated improper statements have devastated PSI's credibility as reflected by the Company's more than ***$841 million***, or ***92%***

-6-

*market capitalization loss* from a high of $913.2 million in May 2014, to less than $72 million at present.

15.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of at least one consolidated federal securities class action complaint filed in the U.S. District Court for the Northern District of Illinois on behalf of investors who purchased PSI's shares (the "Securities Class Action").  The Securities Class Action brings claims against PSI and certain of the Individual Defendants in connection with the Company's misleading statements, GAAP violations, and improper revenue recognition, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

16.     To add insult to injury, in violation of title 8, section 211 of the Delaware General Corporations Law Code ("Section 211"), the Board has utterly failed to ensure that PSI has held an Annual Meeting of Stockholders to elect directors within the last twenty-six months, and during this time period there has been no action by written consent to elect PSI directors in lieu of an Annual Meeting.

17.     Because of the violation of Section 211, the Company's stockholders have been unable to voice their frustrations at an Annual Meeting or by withholding their votes for these faithless fiduciaries.

18.     Plaintiffs bring this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs.  In addition, this Court has

supplemental jurisdiction under 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because: (i) nominal defendant PSI is headquartered in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this this District; (iii) a substantial portion of the transactions and wrongdoing detailed herein, including the defendants' primary participation in the wrongful acts alleged herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to PSI occurred in this District; (iv) defendants received substantial compensation in this District as a result of doing business here and engaging in other activities that had an effect in this District.

## PARTIES

**Plaintiffs**

21.     Plaintiff Travis Dorvit is a holder of shares of PSI common stock, was a holder of shares of PSI common stock at the time of the wrongdoing alleged herein, and has been a holder of shares of PSI common stock continuously since that time. Plaintiff Travis Dorvit is a citizen of the State of South Carolina.

22.     Plaintiff Michael Martin is a holder of shares of PSI common stock, was a holder of shares of PSI common stock at the time of the wrongdoing alleged herein, and has been a holder of shares of PSI common stock continuously since that time. Plaintiff Michael Martin is a citizen of the State of Tennessee.

**Nominal Defendant**

23.     Nominal defendant PSI is a Delaware corporation with its principal executive offices located at 201 Mittel Drive, Wood Dale, Illinois, and therefore is a citizen of Delaware and Illinois. PSI designs, manufactures, distributes, and supports power systems for industrial

original equipment manufacturers across a broad range of industries and road-markets, including medium duty fleets, delivery trucks, school buses, and garbage trucks. PSI's common stock previously traded on NASDAQ under the ticker symbol "PSIX." On April 19, 2017, NASDAQ suspended trading the shares of PSI. On July 21, 2017, as a result of PSI's non-compliance with SEC filing requirements, NASDAQ delisted the Company's stock altogether.

**Defendants**

24. Defendant Gary S. Winemaster ("Gary Winemaster") is a co-founder of PSI and served as its CEO, President, and a director from 2001 until April 6, 2017. Prior to the incorporation of PSI's predecessor in 2001, defendant Gary Winemaster had served as CEO and President of PSI's parent company Power Great Lakes, Inc. ("Power Great Lakes") since 1992. He now serves as the Company's Chief Strategy Officer, in what is described as a "non-executive role." Until March 2017, he owned 36.02% of the Company's outstanding stock, and when combined with the shares of his brother (defendant Kenneth Winemaster) was enough to give them control of the Company with at least 56% of all outstanding shares. As of December 2017, he still owned 19.4% of the Company's stock. Defendant Gary Winemaster knowingly, recklessly, or with gross negligence: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the

previous Annual Meeting. PSI paid defendant Gary Winemaster the following compensation as an executive:

| Year | Salary | Bonus | All Other Compensation | Total |
|------|--------|-------|------------------------|-------|
| 2015 | $540,000 | - | $57,047 | $597,047 |
| 2014 | $540,000 | $380,000 | $50,950 | $970,950 |

Defendant Gary Winemaster is a citizen of the State of Illinois.

25. Defendant Kenneth Winemaster is the brother of Gary Winemaster and has served as PSI's Senior Vice President ("SVP") since 2001. Until March 2017, Kenneth Winemaster owned 20.28% of the Company's outstanding common stock, enough in combination with his brother to control the Company. Previously, he served as a director of PSI's predecessor from 2001 to 2011 and secretary from 2001 to 2013. On November 28, 2017, Kenneth Winemaster executed a new Executive Employment Agreement with the Company in the role of Executive Vice President of Production. He still owned 11.8% of the Company's stock according to a December 5, 2017 filing. Defendant Kenneth Winemaster knowingly, recklessly, or with gross negligence: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. PSI paid defendant Kenneth Winemaster the following compensation as an executive:

-10-

| Year | Salary | Bonus | All Other Compensation | Total |
|------|--------|-------|------------------------|-------|
| 2015 | $272,500 | - | $40,218 | $312,718 |
| 2014 | $272,500 | $170,000 | $33,367 | $475,867 |

Kenneth Winemaster is a citizen of the State of Illinois.

26.     Defendant Daniel P. Gorey ("Gorey") served as PSI's CFO from April 2012 through October 19, 2015. Previously, he served as the Company's SVP of Finance from July 2011 through March 2012. Defendant Gorey knowingly, recklessly, or with gross negligence: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. PSI paid defendant Gorey the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | All Other Compensation | Total |
|------|--------|-------|--------------|------------------------|-------|
| 2015 | $289,808 | - | $26,401 | $30,642 | $346,851 |
| 2014 | $285,000 | $200,000 | - | - | $485,000 |

Defendant Gorey is a citizen of the State of Illinois.

27.     Defendant Jay Hansen ("Hansen") served as a director of PSI from October 26, 2011 until May 31, 2017. He had served as a member of the Board's Audit Committee since the Audit Committee was formed in January 2012, and as the Audit Committee's Chairman since mid-2013. He is the co-founder, President, and Managing Partner of O2 Investment Partners, LLC, a private equity investment group focusing on small and middle market manufacturing,

niche distribution, select services and technology businesses. Previously, defendant Hansen was a consultant in the financial and manufacturing industries, and served as Vice President, Chief Financial Officer, and COO of Noble International, Ltd., a supplier of automotive parts, component assemblies, and services in the automotive industry. He has served as a director, Chairman of the Audit Committee, and member of the Compliance and Risk Committee of Flagstar Bancorp. According to the Company's public filings, defendant Hansen has "significant knowledge of [PSI's] industry and relevant business and financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements." Defendant Hansen knowingly or recklessly: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Hansen is a citizen of the State of Michigan.

28. Defendant Ellen R. Hoffing ("Hoffing") served as a director of PSI from September 18, 2015 until May 31, 2017 and was a member of the Board's Audit Committee since she joined the Board. Defendant Hoffing served as COO and Co-President of Neos Therapeutics, a specialty pharmaceutical company, from September 2009 to April 2014. She

previously served as President and CEO of Applied NeuroSolutions, Inc., a development stage biopharmaceutical company. Defendant Hoffing has served as a director of Perrigo Company plc, a global healthcare provider, since July 2008 and currently serves on its audit committee. According to the Company's public filings, defendant Hoffing has "relevant business experience, and … financial expertise, which is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements." Defendant Hoffing knowingly or recklessly: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Hoffing is a citizen of the State of Illinois.

29.     Defendant Kenneth Landini ("Landini") has served as a director of PSI since 2001 and, according to the Company's public filings, has "assisted in the development and growth of the business of our company since 1985." Defendant Landini previously served as Vice President of Finance for Power Great Lakes and "assisted us in establishing distributor relationships and expanding the territories into which we provide our power systems." Following the reverse merger that took the Company public in 2011, both Gary and Kenneth Winemaster gave Landini "gifts" of Company preferred stock. Although he was admittedly not

independent according to the Company's public filings, defendant Landini served as Chairman of the Board's Audit Committee from the Audit Committee's formation in January 2012 until mid-2013. Consistent with the troubled control culture of PSI and despite the fact that Landini was not independent, he was appointed as the Board's "Lead Outside Director."  Landini is a partner and co-founder of Landini, Reed & Dawson, P.C., a certified public accounting and consulting firm in southeastern Michigan, which provides tax advice and consultation services to the Company. Defendant Landini knowingly or recklessly: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting.  Defendant Landini is a citizen of the State of Michigan.

30.     Defendant Michael P. Lewis ("Lewis") had served as CFO of the Company since October 19, 2015, and had assumed the operational responsibilities of former COO Mr. Cohen since his departure from the Company in May 2016.  Previously he served as Vice President, Finance and CFO of North American Operations of Benteler Automotive beginning in 2013.  On February 1, 2017, after RSM announced it could no longer rely upon management's representations, defendant Lewis agreed to take a leave of absence from the Company and relinquish his duties until further notice.  Also on February 1, 2017, defendant Lewis submitted a

letter of resignation from the Company effective March 4, 2017. From 2010 to 2012, defendant Lewis served as Vice President, Treasurer, and director of Investor Relations of Visteon Corporation, and previously served in various roles at Visteon Corporation since 2000. Defendant Lewis knowingly, recklessly, or with gross negligence: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. PSI paid defendant Lewis the following compensation as an executive:

| Year | Salary | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2015 | $66,667 | $777,600 | $17,814 | $862,081 |

Defendant Lewis is a citizen of the State of Illinois.

31. Defendant Mary E. Vogt ("Vogt") served as a director of PSI from 2011 until her resignation effective May 31, 2017. She was a member of the Board's Audit Committee since the Audit Committee's formation in January 2012 until May 2017. She has served as President of Home Access Health Corporation since 2008 and previously was its CFO. From 1999 to 2003, defendant Vogt was a consultant to businesses in the manufacturing and e-commerce industries. From 1995 to 1998 she was the worldwide director of internal audit for the Leo Burnett Company, an advertising and marketing firm. According to the Company's public filings, defendant Vogt has "relevant business experience as well as … financial expertise, which

is important as our Board exercises its oversight responsibility regarding the quality and integrity of our accounting and financial reporting processes and the auditing of our financial statements." Defendant Vogt knowingly or recklessly: (i) failed to ensure a proper tone at the top; (ii) caused or allowed PSI to improperly record revenue in violation of GAAP and the Company's own policies for years; (iii) caused or allowed the Company to misstate its revenue for years; (iv) caused or allowed the Company to operate with inadequate financial, internal, and disclosure controls for years; (v) caused or allowed the Company to make improper statements in its press releases and SEC filings concerning PSI's financial prospects and internal and disclosure controls; (vi) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (vii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Vogt is a citizen of the State of Illinois.

32.     Defendant Shaojun Sun ("Sun") is PSI's Chairman of the Board and a director and has been since April 2017. Defendant Sun was also a member of PSI's Compensation Committee in at least April 2017. Defendant Sun knowingly or recklessly: (i) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (ii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Sun is a citizen of Shandong Province, China.

33.     Defendant Jiang Kui ("Kui") is a PSI director and has been since April 2017. Defendant Kui was also a member of PSI's Compensation Committee in at least April 2017. Defendant Kui knowingly or recklessly: (i) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (ii) failed to ensure PSI held its most recent Annual Meeting

of Stockholders within thirteen months of the previous Annual Meeting. Defendant Kui is a citizen of Shandong Province, China.

34. Defendant Jason Lin ("Lin") is a PSI director and has been since May 2017. Defendant Lin was also a member of PSI's Audit Committee in at least July 2017. Defendant Lin knowingly or recklessly: (i) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (ii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Lin is a citizen of the State of Illinois.

35. Defendant Leslie A. Coolidge ("Coolidge") is a PSI director and has been since July 2017. Defendant Coolidge was also the Chairman of PSI's Audit Committee and a member of that committee in at least July 2017. Defendant Coolidge knowingly or recklessly: (i) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (ii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Coolidge is a citizen of the State of Illinois.

36. Defendant Frank P. Simpkins ("Simpkins") is a PSI director and has been since July 2017. Defendant Simpkins was also a member of PSI's Audit Committee in at least July 2017. Defendant Simpkins knowingly or recklessly: (i) failed to ensure the timely and accurate filing of PSI's Annual and Quarterly Reports; and (ii) failed to ensure PSI held its most recent Annual Meeting of Stockholders within thirteen months of the previous Annual Meeting. Defendant Simpkins is a citizen of the Commonwealth of Pennsylvania.

37. The defendants identified in ¶¶24-26, 30 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶24-25, 27-29, 31-36 are referred to herein as the "Director Defendants." The defendants identified in ¶¶27-28, 31 are referred to herein as the

-17-

"Audit Committee Defendants." Collectively, the defendants identified in ¶¶24-36 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

38. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, each of the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, due care, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      (a)     ensure PSI maintained adequate internal controls;

      (b)     ensure PSI acted in accordance with GAAP;

      (c)     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     exercise good faith in ensuring that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, including acting only within the scope of its legal authority;

(e)     remain informed as to PSI's business and operations, and, when placed on notice of and/or upon receipt of information of improper or imprudent conduct by the Company and/or its employees, make reasonable inquiry in connection therewith, and exercise good faith in taking action to correct such practices or misconduct, prevent its recurrence, and make such disclosures as necessary to comply with applicable laws; and

(f)     exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading.

40.     The Individual Defendants, as well as all employees, directors, and officers of the Company, were and are required to comply with the Power Solutions International, Inc. Code of Business Conduct and Ethics (the "Code of Conduct").  The purpose of the Code of Conduct is, *inter alia*, to "ensure that all of the Company's directors, officers and employees observe the highest standards of ethics in the conduct of the Company's business, avoiding even the appearance of impropriety."

41.     The Code of Conduct provides that:

It is the responsibility of every officer, employee and director, and the policy of the Company to encourage its officers, employees and directors, to ask questions, seek guidance, and report in good faith (a) any questionable accounting, financial, or auditing matters, including, without limitation, any (i) fraud, deliberate error or misrepresentations in the preparation, evaluation, review or audit of any financial statements of the Company, (ii) fraud, deliberate error or misrepresentation in the recording and maintaining of financial records of the Company, (iii) noncompliance with the Company's internal accounting controls, or (iv) misrepresentation or false statements to or by a senior officer or accountant of the Company regarding a matter

contained in the Company's financial records, financial reports or audit reports, or (b) any known or possible violations of this Code, other Company policies or compliance programs, or applicable law.

42.     Defendants Gary Winemaster (as former CEO), and defendants Gorey and Lewis (both as former CFOs) were also subject to the Power Solutions International, Inc. Code of Ethics for Principal and Senior Financial Officers (the "Financial Officer Code of Conduct"), which states that the Company "strives to maintain the highest standards of accuracy, completeness and integrity in its financial dealings, records and reports."

43.     The Financial Officer Code of Conduct required that defendants Gary Winemaster, Gorey, and Lewis comply with the following:

1.     Honest and Ethical Conduct

The Senior Officers will exhibit and promote honest and ethical conduct by:

◦ Encouraging and rewarding professional integrity and eliminating barriers to responsible behavior.

◦ Promoting the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

◦ Respecting the confidentiality of information acquired in the course of work, except when authorized or otherwise legally obligated to disclose such information.

◦ Periodically communicating these ethical standards throughout the organization.

2.     Financial Records and Periodic Reports

The Senior Officers will establish and manage the enterprise transaction and reporting systems and procedures to provide that:

◦ Business transactions are properly authorized and accurately and timely recorded on the Company's books and records in accordance with U.S. generally accepted accounting principles (GAAP) and policies established by the Company.

◦ False or artificial statements are not made in the Company's books and records, financial statements or related communications.

◦ The retention or proper disposal of Company records shall be in accordance with applicable legal and regulatory requirements and any records retention policies established by the Company.

◦ Reports and documents filed by the Company with, or submitted by the Company to, the Securities and Exchange Commission, as well as other public communications made by the Company, will include full, fair, accurate, timely and understandable disclosure.

3.      Compliance with Applicable Laws, Rules and Regulations

The Senior Officers will establish mechanisms to:

◦ Educate Company employees about applicable governmental laws, rules and regulations.

◦ Monitor compliance with applicable governmental laws, rules and regulations.

44.     Defendants Gary Winemaster, Gorey, and Lewis were also required to promptly

bring certain matters to the attention of the Audit Committee, including:

◦ Material information that calls into question disclosures made by the Company in its filings with, or submissions to, the Securities and Exchange Commission or in other public communications.

◦ Information concerning significant deficiencies or material weaknesses in the design or operation of the Company's "internal control over financial reporting" (as defined in Rule 13a-15 promulgated under the Securities Exchange Act of 1934, as amended) or other factors that could adversely affect the Company's ability to record, process, summarize and report financial data on a timely basis.

◦ Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal control over financial reporting.

◦ Information concerning a violation of this Code or any other Company conduct codes, including any actual or apparent conflicts of interest between personal and professional relationships, involving management or other employees who have a significant

role in the Company's financial reporting, disclosures or internal control over financial reporting.

∘ Evidence of a material violation of applicable governmental laws, rules or regulations by the Company or its employees or agents.

45. In addition to their duties as Board members, the Audit Committee Defendants—defendants Hansen, Hoffing, and Vogt—had certain duties by virtue of their positions on the Audit Committee. These duties are set forth in the Audit Committee Charter adopted in January 2012.

46. According to the Audit Committee Charter, the purpose of the Audit Committee is to assist the Board "in overseeing (1) the integrity of the Company's financial statements; (2) the Company's compliance with legal and regulatory requirements; (3) the qualifications and independence of the registered public accounting firm that audits the Company's financial statements (the "Auditors"); (4) the performance of the Auditors and of the Company's internal audit function (if applicable); and (5) the Company's internal accounting and financial reporting controls."

47. The Audit Committee is tasked with appointing, monitoring the performance and independence of, and approving services of the Company's independent auditors. In addition, the Audit Committee is required to:

> (d) Audit Plan and Conduct. The Committee shall review with the Auditors and management (including the Company's chief financial officer and principal accounting officer) the audit plan of the Auditors, including the scope of their audit and general audit approach. The Committee shall discuss with the Auditors the matters required to be discussed by Statement on Auditing Standards No. 114 relating to the conduct of the audit, and Statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1 AU Section 380), as adopted by the PCAOB in Rule 3200T, which matters include the Auditors' responsibilities under generally accepted auditing standards, significant accounting policies, the process used by management in formulating accounting estimates and the basis for the Auditors'

conclusions regarding the reasonableness of these estimates, significant audit adjustments, the Auditors' responsibilities for other information in documents containing audited financial statements, any procedures performed and the results thereof, disagreements with management, significant matters that were the subject of management's consultation with other accountants, major issues that were discussed with management in connection with the initial or recurring retention of the Auditors, and difficulties encountered by the Auditors in dealing with management related to the performance of its audit.

(e) Establishment of Internal Audit Function. If not already established, the Committee shall periodically evaluate whether the Company should establish an internal audit function (with Company personnel and/or on an outsourced basis), and if the Committee determines that an internal audit function should be established, the Committee shall oversee that the Company takes such steps with respect to the establishment of such function as deemed appropriate by the Committee. The Committee may decide to outsource all or part of such internal audit function. The director of the internal audit function (if any) shall report directly to the Committee, and shall also report to the Company's chief financial officer for administrative purposes. If an internal audit function is established, the Committee shall periodically (1) review with the Company's management, as well as the persons performing the Company's internal audit function, the plans, activities, staff, organizational structure and effectiveness of the internal audit function, and (2) review findings and recommendations from completed internal audits.

(f) Review of Auditor Report. The Committee shall obtain and review a report from the Auditors at least annually as to (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within GAAP that have been discussed with management, including the ramifications of such alternative disclosures and treatments and the treatment preferred by the Auditors, and (3) any other material written communications between the Auditors and management, including management letters and schedules of unadjusted audit differences.

(g) Confirmation Regarding Illegal Acts. Promptly after the completion of each audit of the Company conducted by the Auditors, the Committee shall obtain from the Auditors confirmation that the Auditors have not detected or otherwise become aware of information indicating that an illegal act has or may have occurred, pursuant to Section 10A(b) of the Exchange Act.

(h) Committee Meetings with Auditors. The Committee shall conduct meetings with the Auditors, without management present, to discuss candidly any audit problems or difficulties and management's responses to the Auditors' efforts to resolve such problems.

48. The Audit Committee is also tasked with oversight of the Company's internal controls and compliance. Specifically, this includes:

(a) Review of Internal Controls and Accounting/Financial Resources. The Committee shall review and discuss with the Auditors, financial and accounting personnel and the internal auditors (if applicable) (i) the quality and depth of staffing in, and resources of, the Company's accounting, information services and financial departments, as needed, and (ii) the adequacy of the Company's internal control over financial reporting and disclosure controls and procedures, including controls and security procedures with respect to the Company's information systems and the Company's process for assessing risk of fraudulent financial reporting and detecting major control weaknesses, and any related significant findings and recommendations of the Auditors and the internal auditors (if applicable) (e.g., regarding deficiencies, significant deficiencies or material weaknesses), together with management's responses thereto, and the adequacy of disclosures about changes in internal control over financial reporting. The Committee shall also review with the Auditors, the internal auditors (if applicable) and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

(b) Management's Internal Controls Report. The Committee shall review and discuss with the Auditors and management the report of management on the Company's internal control over financial reporting to be included when required in the Company's Annual Report on Form 10-K prior to filing such Annual Report on Form 10-K with the SEC.

(c) Submission of Complaints. The Committee shall establish procedures for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, (2) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters, and (3) the dissemination of the procedures developed pursuant to clause (2) above in a manner reasonably calculated to make them

known to all Company employees. The Committee shall monitor and promote the Company's adherence to these procedures.

(d) Financial Risk Exposure and General Compliance. The Committee shall discuss and review with management the Company's major financial risk exposure and the steps management takes to implement plans to monitor and mitigate such risks, including risk assessment and management policies. Such risks and exposures include, but are not limited to, threatened and pending litigation, claims against the Company, any published reports that raise material issues regarding the Company's financial statements or accounting policies, tax matters, legal and regulatory compliance and correspondence between the Company and any regulatory or governmental authorities, and matters that could materially impact the Company's internal control over financial reporting, disclosure controls and procedures and financial reporting. The Committee shall review the Company's procedures for monitoring compliance with laws and regulations; as well as the Company's code of conduct and other policies relating to compliance with laws and regulations, throughout the Company.

(e) Debt Instruments. The Committee shall review and discuss with the Auditors and management the Company's compliance with financial covenants in its credit facility and other material outstanding debt instruments, as well as any material debt instruments issued by any of the Company's subsidiaries.

(f) Related Party Transactions and Conflicts of Interest. The Committee shall review and approve (or deny) related party transactions and resolve conflicts of interest questions involving Board members or management and review, and monitor compliance with, any written policies of the Company regarding related party transactions or conflicts of interest.

49. With respect to PSI's financial reporting, the Audit Committee's duties are as follows:

(a) Financial Statement Review. The Committee shall review and discuss with management and the Auditors the Company's annual audited and quarterly unaudited financial statements, including the Auditors' audit reports and the results of the Auditors' review of the quarterly financial statements (as applicable), as well as the related "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case prior to filing the financial statements with the SEC. The Committee shall recommend to the Board whether the annual financial statements should be included

in the Company's Annual Report on Form 10-K filed with the SEC. The Committee shall also authorize the filing by the Company of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q containing the Company's financial statements.

(b) Earnings Release Review. Prior to their release, the Committee shall review all of the Company's earnings releases.

(c) Disclosure Principles and Practices. The Committee shall discuss with the Auditors their judgments about the quality, not just the acceptability, of the Company's accounting principles and financial disclosure practices used or proposed and the appropriateness of significant management judgments. The Committee shall discuss with the Auditors and management the effect of regulatory and accounting initiatives, as well as any off-balance sheet structures, on the Company's financial statements.

(d) Fraud Certification Disclosures. The Committee shall review and discuss disclosures made to the Committee by the Company's chief executive officer and chief financial officer during the certification process for the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q about the effectiveness of the Company's disclosure controls and procedures, any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees having a significant role in the Company's internal control over financial reporting.

(e) Audit Committee Report. Based upon discussions with, and reliance upon, the Auditors and management, the Committee shall annually review and approve the report required by SEC rules to be included in the Company's annual proxy statement. In addition, the Committee will review any other audit committee-related disclosure in the Company's filings with the SEC or otherwise as required by applicable securities laws, rules and regulations or, if the Company's securities have become listed on a national securities exchange, by the rules of such exchange.

50. In addition, the Audit Committee Defendants were "responsible for recommending appropriate disciplinary and/or remedial actions" in the event of a violation of the Financial Officer Code of Conduct.

**BREACHES OF DUTIES**

51.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of PSI, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

52.     During the relevant period, as described herein, the Individual Defendants were well aware of the problems with the Company's internal controls and its deficient accounting and financial reporting practices, procedures, and systems.  Through their attendance at Board, Audit Committee, and management meetings, their review of the Company's financial statements, and conversations with the Company's management, auditors, and consultants, the Individual Defendants knew PSI lacked adequate accounting and financial reporting systems, yet they declined to implement the necessary systems and expertise.

53.     In breach of their fiduciary duties of loyalty and good faith and enumerated responsibilities under the Code of Conduct, Financial Officer Code of Conduct (with respect to defendants Gary Winemaster, Gorey, and Lewis), and Audit Committee Charter (with respect to defendants Hansen, Hoffing, and Vogt), the Individual Defendants willfully ignored the deficiencies in the Company's accounting and financial reporting systems and failed to make a good faith effort to address them.

54.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate with inadequate internal controls, misrepresent its revenues for years in violation of GAAP, and pay improper

compensation packages to certain defendants, improper practices that wasted the Company's assets and caused PSI to incur substantial damage.

55.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, PSI has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

56.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

57.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of PSI, regarding PSI's revenues and the Individual Defendants' management of PSI's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at PSI and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

58.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

59.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

60.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

61.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of PSI

62.     PSI designs, manufactures, distributes and supports power systems for industrial original equipment manufacturers across a broad range of industries and road-markets, including

medium duty fleets, delivery trucks, school buses and garbage trucks. Its primary facilities are located in Illinois, Wisconsin and Michigan.

63.     The Company's predecessor was founded in 1985. On April 29, 2011, The W Group, Inc. ("W Group") commenced a reverse merger transaction with Format, Inc. ("Format"), a Nevada corporation that had nominal operations and assets. As a result of the reverse merger, Format became PSI, and PSI succeeded to the business of the W Group. In August 2011, PSI merged into its subsidiary with the same name incorporated in Delaware, thereby becoming a Delaware corporation. The reverse merger allowed the Company to avoid the increased regulatory scrutiny it would have faced if the Company went public by way of an initial public offering.

64.     Immediately following the reverse merger until March 31, 2017, the Company's founder, defendant Gary Winemaster, together with his brother, defendant Kenneth Winemaster, became the Company's majority stockholders, collectively holding more than 50% of PSI's stock.[2]

**From the Outset, PSI Struggles to Implement Adequate Internal Controls**

65.     The Individual Defendants have long been on notice of substantial problems with the Company's accounting and internal controls. Following the reverse merger, the Company disclosed that it was in the process of building and enhancing its internal controls, and noted that the appropriateness of such controls would be more fully assessed at the end of the next fiscal year. Indeed, the Company did not even have an Audit Committee until January 2012. When the Audit Committee was finally formed, it consisted of defendants Hansen, Landini, and Vogt.

---

[2] Their father, William Winemaster, was also a Company employee who performed "consulting and advisory type services" and collected a salary of over $150,000 per year, plus automobile and mobile telephone allowances.

Despite the fact that he was admittedly not independent, defendant Landini served not only as a member of the Audit Committee but also as its Chairman.

66.     In its Form 10-K for fiscal year 2011 filed with the SEC on March 30, 2012 (the "2011 Form 10-K"), the Company disclosed that prior to the reverse merger, the W Group was a private company and therefore was not subject to public company reporting obligations.  As a result, it had little, if any, accounting and internal controls.  In addition, the 2011 Form 10-K disclosed that the Company had not yet performed an annual assessment of the effectiveness of its internal control over financial reporting pursuant to SOX, but it intended to do so at the end of fiscal year 2012.  In particular, PSI's 2011 Form 10-K stated in relevant part:

**Item 9A. Controls and Procedures.**

**Disclosure Controls and Procedures**

As a result of the reverse recapitalization, Power Solutions International, Inc. succeeded to the business of The W Group. Since the consummation of the reverse recapitalization, we have not been engaged in the business or operations conducted by Format prior to the reverse recapitalization. Accordingly, we do not in any way maintain the disclosure controls and procedures or the internal control over financial reporting of Format in effect prior to the reverse recapitalization, and such disclosure controls and procedures and internal control over financial reporting of Format are not relevant to us.

Prior to the consummation of the reverse recapitalization, The W Group was a private operating company and, as a result of the reverse recapitalization, we became a public company subject to public company reporting obligations. As a result, ***we have had to, and we currently continue to, enhance and supplement our internal accounting resources with additional accounting and finance personnel with the requisite technical and public company experience and expertise, and more generally strengthen our disclosure controls and procedures and our internal control over financial reporting to enable us to accurately and timely prepare our consolidated financial statements and otherwise satisfy these reporting obligations.*** In particular, in June 2011, we established a disclosure and compliance committee (the "Disclosure Committee"), consisting of

senior members of our finance and accounting department and other members of senior management, and adopted disclosure and compliance committee guidelines...  During the fiscal year ended December 31, 2011, we also retained additional staff in our finance and accounting department, and on July 18, 2011 we hired an additional senior financial professional with prior public company experience, thereby further strengthening the overall capabilities of our finance and accounting department. In August 2011, we created an internal accounting department and hired an internal audit manager with prior experience implementing and evaluating our compliance with Sarbanes-Oxley Act of 2002.

Because The W Group was a private operating company prior to the reverse recapitalization and we do not in any way maintain the internal control over financial reporting of Format in effect prior to the reverse recapitalization, *we have not yet (as we are not yet required to have) performed an annual assessment of the effectiveness of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act of 2002*. Furthermore, as a smaller reporting company, we are not subject to the requirement that we provide an attestation report of our auditors on our internal control over financial reporting, and we will not be subject to such requirement until we become either an accelerated filer or a large accelerated filer.  *We intend to perform an assessment of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 as of the end of our fiscal year ending December 31, 2012 and include the results in our annual report on Form 10-K for such fiscal year*. Any such annual assessment could identify significant deficiencies or material weaknesses in our internal control over financial reporting, and we cannot provide any assurances that we will be successful in remediating any deficiencies or weaknesses that may be identified.

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this annual report. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported accurately and within the time frames specified in the SEC's rules and forms and that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our

management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, ***our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of December 31, 2011 at the reasonable assurance level, even though, following the reverse recapitalization, we and our internal auditors have not yet consummated any annual assessment of our internal control over financial reporting procedures pursuant to Section 404 of the Sarbanes-Oxley Act of 2002.*** Our Chief Executive Officer and Chief Financial Officer reached this conclusion based in large part on their assessment of (1) the financial expertise of our Chief Financial Officer, and other members of our finance and accounting department and the members of the Disclosure Committee, (2) the regular communications among such persons, including the members of the Disclosure Committee, and between them and others within our relatively small organization, with respect to all material developments in our business, and (3) the overall process of preparation and review of our financial and other disclosures.

67. The following year, PSI filed the 2012 Form 10-K with the SEC on March 12, 2013. Not surprisingly, the 2012 Form 10-K disclosed that when management performed its first annual assessment of the effectiveness of PSI's internal controls pursuant to SOX, material weaknesses in the Company's internal and financial controls were discovered, and that as of December 31, 2012, the Company's internal control over financial reporting "were not effective" and "may not prevent or detect misstatements." Specifically, according to the disclosure, the Company's controls over the business system software used in PSI's aftermarket parts group were not adequate, as: (i) all users of the software had access to add, delete, or modify any data; (ii) there were no controls in place to adequately monitor transactions within the software; and (iii) the software users were not assigned detailed security rights, and users gained access to system modules through use of passwords that were not periodically changed to ensure that only appropriate individuals had access to each module.

68. The 2012 Form 10-K also indicated that the Company's internal controls needed improvement generally, stating "under the direction of the Audit Committee, management will continue to review and make necessary changes to the overall design of our internal control environment to improve internal controls over financial reporting." In addition, the 2012 Form 10-K assured that management had been "actively engaged in developing and implementing a remediation plan to address the material weakness" which would purportedly "effectively remediate" the problems, including by increasing security measures with respect to the Company's business system software and implementing a database monitoring tool to effectively monitor key transactions within the software. The 2012 Form 10-K further touted that the Company was well positioned "to capitalize on developing trends in the industrial OEM markets and drive significant future growth."

69. From March 2013 through early 2014, the Company continued to warn in its Quarterly Reports filed with the SEC on Forms 10-Q that PSI's internal controls were not yet deemed effective. These same Forms 10-Q and other announcements from the Company nonetheless continued to highlight impressive sales and revenues increases, backed by "strong" and "increasing" demand for PSI's products. As a result of these continuing impressive growth predictions, PSI's stock price steadily soared throughout 2013, starting the year at $16.18 per share and finishing at $75.10 per share at the end of the year, an increase of more than 464%.

**The Individual Defendants Announce the Purported Remediation of PSI's Deficient
Internal Controls and Tout Strong Sales Growth**

70. As detailed below, beginning in early 2014, PSI's management disclosed that it had remedied the Company's long-standing problems with its internal controls. For the next two and a half years through the second half of 2016, the Individual Defendants repeatedly boasted that the Company's "disclosure controls and procedures were effective," while also highlighting

PSI's purportedly impressive sales and revenue growth. As the Company was ultimately forced to admit, all of these statements were woefully inaccurate. Indeed, the Company continued to operate with a material weakness in financial controls and improperly recognized revenue throughout this time period.

71. On February 27, 2014, PSI issued a press release announcing its fourth quarter and full year 2013 financial results. The press release proclaimed that the Company experienced "solid performance" in the fourth quarter, with a net sales increase of 17% for the fourth quarter of 2013 compared to the same quarter in 2012, and further stated that the quarter "capped a very successful year," with a full year sales increase of 18% compared to 2012.

72. The next day, on February 28, 2014, PSI filed its 2013 Form 10-K with the SEC, signed by Officer Defendants Gary Winemaster and Gorey, and Director Defendants Gary Winemaster, Landini, Hansen, and Vogt, with signed certifications by defendants Gary Winemaster and Gorey pursuant to SOX. The 2013 Form 10-K misleadingly claimed that the Company had "remediated the previously identified material weakness," that PSI's controls and procedures were "designed to ensure that information required to be disclosed in [SEC filings was adequate]," and that the Company's "internal control over financial reporting was effective." The 2013 Form 10-K also claimed the Company's financial statements were performed in accordance with GAAP. The 2013 Form 10-K stated:

> **Disclosure Controls and Procedures**
>
> *We maintain a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed in the reports that we file or submit under the Securities Exchange Act of 1934 as amended (the "Exchange Act") is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission*, and that such that information is accumulated and communicated to our management, including our Chief Executive

Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of the end of the period covered by this report and pursuant to Rule 13a-15(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), our management, including the Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness and design of our disclosure controls and procedures (as that term is defined in Rule 13a-15(b) of the Exchange Act). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that *our disclosure controls and procedures were effective, as of the end of the period covered under this report*.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934, as amended. Internal control over financial reporting is a process designed by, or under the supervision of the Chief Executive Officer and Chief Financial Officer, or persons performing similar functions, and effected by our board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the *preparation of the financial statements for external purposes in accordance with United States generally accepted accounting principles ("U.S. GAAP")*. Internal control over financial reporting includes those policies and procedures that:

- Pertain to the maintenance of records that, in reasonable detail, accurately reflect our transactions and dispositions of assets.

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP and that our receipts and expenditures are made in accordance with authorization of our management and our board or directors.

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on our consolidated financial statements.

Under the supervision of our Chief Executive Officer and Chief Financial Officer, our management conducted an assessment of the

effectiveness of our internal control over financial reporting as of December 31, 2013, based on criteria established in the framework in the Internal Control-Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, our management has concluded that *as of December 31, 2013, our internal control over financial reporting was effective* based on those criteria. Management reviewed the results of its assessment with our Audit Committee. The effectiveness of our internal control over financial reporting as of December 31, 2013 has been reviewed by McGladrey LLP, an independent registered public accounting firm, as stated in its attestation report which is included in this Annual Report on Form 10-K.

**Changes in Internal Control Over Financial Reporting**

During the fiscal quarter ended December 31, 2013, *we implemented internal control procedures to address a previously identified material weakness related to the business system software used within our aftermarket parts group*. These internal controls included (a) assigning detailed security rights to the software including periodic password changes, and (b) implementing a database monitoring tool to monitor key transactions within the software. After completing our testing of design and operating effectiveness of these new procedures, we concluded that *we had remediated the previously identified material weakness as of December 31, 2013*.

73.     With the Company now backed by continued promises of growth and purportedly sound internal controls, PSI's stock price rose to an impressive all-time high of $84.45 per share on March 10, 2014, the week after the 2013 Form 10-K was filed.

74.     On April 1, 2014, PSI announced that it acquired Professional Power Products, Inc. ("3PI") for $46 million in cash, the Company's largest acquisition to date.  According to the announcement, in 2013, 3PI generated net sales and operating income of approximately $40.3 million and $7.9 million, respectively, and the transaction was "expected to be accretive to the Company's results in 2014."   Defendant Gary Winemaster further proclaimed in the announcement that 3PI brought PSI a "talented management team," and would "broaden[] the

Company's product offerings and is expected to accelerate growth with both new and existing customers globally."

75.     On May 8, 2014, PSI issued a press release announcing its first quarter 2014 financial results. The press release stated that for the first quarter, PSI experienced an impressive 27% increase in net sales compared to the same quarter in 2013, and a 9% sequential increase from the fourth quarter of 2013. Defendant Gary Winemaster boasted that the Company's products "continued to drive growth for [PSI]," and stated that the Company's recent 3PI acquisition "creates a tremendous combination that should position us well for growth in the years ahead."

76.     On May 9, 2014, PSI filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2014, with the SEC. The Form 10-Q reaffirmed the above announced financial results and claimed that the Company's "disclosure controls and procedures were effective."

77.     On August 7, 2014, the Company issued a press release announcing its second quarter 2014 results. The Company reported net sales of $83,378,000, an increase of 41% compared to the second quarter of 2013 and a 25% sequential increase compared to the first quarter of 2014.

78.     On August 8, 2014, PSI filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2014, with the SEC. The Form 10-Q reaffirmed the above announced financial results and reassured the market that the Company's "disclosure controls and procedures were effective."

79.     On November 6, 2014, the Company issued a press release announcing its third quarter 2014 results. The Company reported net sales of $93,972,000, an increase of 45% from $64,628,000 in the third quarter of 2013, and a 13% sequential increase from $83,378,000 in the

second quarter of 2014. Defendant Gary Winemaster proclaimed in the press release that the results purportedly "demonstrate[d] the resilience of [the Company's] business model and market opportunities," and that "[s]olid demand across [PSI's] end-markets drove strong sales growth and attractive gross margin expansion."

80. On November 7, 2014, PSI filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2014, with the SEC. The Form 10-Q reaffirmed the above announced financial results and again assured that the Company's "disclosure controls and procedures were effective."

81. On February 26, 2015, the Company issued a press release announcing its fourth quarter and full year 2014 financial results. For the fourth quarter, the Company announced net sales of $103,910,000, an increase of 69% from the fourth quarter of 2013 and an 11% sequential increase from the third quarter of 2014. For the full year, the press release touted net sales of $347,995,000, astonishing increase of 46%, from 2013.

82. On March 13, 2015, PSI filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Form 10-K"), signed by Officer Defendants Gary Winemaster and Gorey, and Director Defendants Gary Winemaster, Landini, Hansen, and Vogt, with signed SOX certifications by defendants Gary Winemaster and Gorey. The 2014 Form 10-K reaffirmed the above announced financial results and again reassured the market that the Company's "disclosure controls and procedures were effective." Further, the 2014 Form 10-K misrepresented the Company's revenue recognition controls, claiming that revenue was recorded in the proper quarter as appropriate, stating:

> *Revenue recognition*
>
> We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is

fixed or determinable and management believes collectability is reasonably assured. As of December 31, 2014, we had recognized revenue associated with approximately $3.2 million of undelivered product. We anticipate the collection of any unpaid balances during 2015. We did not enter into any bill and hold arrangements during 2013 or 2012.

## PSI Begins to Temper Growth Expectations as It Struggles to Maintain Its Improper Revenue Recognition Scheme

83.     Throughout the remainder of 2015, PSI disclosed a series of disappointing earnings announcements and lowered expected projections.  Unbeknownst to the public, as discussed *supra*, the situation was much worse than a mere slowdown in demand.  Rather, the Company was internally struggling to keep up with its longstanding and improper "pull-forward" revenue recognition scheme.

84.     On May 7, 2015, PSI issued a press release announcing its first quarter 2015 results.  For the quarter, the Company reported net sales of $86,139,000, an increase of 29% from the first quarter of 2014.  Further, although PSI "raised its outlook for full-year 2015 sales growth," the press release noted the Company expected "second quarter 2015 revenue to grow modestly compared to second quarter 2014, and to be in a range similar to first quarter 2015."

85.     On May 8, 2015, PSI filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2015, with the SEC.  The Form 10-Q reaffirmed the above announced financial results and reasserted that the Company's "disclosure controls and procedures were effective."

86.     The May 7, 2015 press release provided the market with the first indication that the Individual Defendants' repeated growth projections might not have been as rosy as previously touted.  On this news, PSI's stock fell 13% between May 7, 2015 and May 12, 2015, from $65.10 per share to $56.64 per share, respectively.

87.     On August 5, 2015, the Company issued a press release announcing its second quarter 2015 results.  The Company reported net sales of $94,629,000, an increase of 13% from

the second quarter of 2014. For the first time, the press release lowered guidance, stating PSI now expected third quarter 2015 revenue to be in the range of $110 million to $130 million, and fourth quarter revenue to be in the range of $140 million to $160 million. In part, the Company blamed the full year guidance reduction on a "slower than expected recovery at the 3PI subsidiary."

88.     On August 7, 2015, PSI filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2015, with the SEC. The Form 10-Q reaffirmed the above announced financial results and reaffirmed that the Company's "disclosure controls and procedures were effective."

89.     As a result of the above news, PSI's stock fell more than 16% between August 5 and August 7, 2015, dropping from $40.11 per share to $33.59 per share, respectively.

90.     On October 28, 2015, PSI preannounced its earnings for the third quarter of 2015. In the announcement, defendant Gary Winemaster touted that the Company's "consolidated results reflect the highest quarterly sales in the history of [PSI], with growth of approximately 18% from the second quarter." Defendant Gary Winemaster admitted, however, that the quarter fell short of consensus estimates, and primarily attributed the problems to 3PI, stating that 3PI "is not yet performing to [PSI's] expectations, and was the primary factor for the shortfall for the quarter relative to consensus estimates." Nonetheless, defendant Gary Winemaster assured investors that PSI "continue[d] to make progress toward integrating 3PI into [its] business, and expect[ed] to bring 3PI to a break-even run rate by year end."

91.     In the wake of the above announced shortfall, PSI's stock price tumbled over 15.6%, from $21.36 per share on October 27, 2015, to $18.01 per share on October 29, 2015.

92.     On November 9, 2015, PSI issued a press release announcing its already pre-announced third quarter 2015 results.  The Company reported net sales for the quarter of $112,008,000, an increase of 19% from the third quarter of 2014 and an 18% sequential increase from the second quarter of 2015.  Defendant Gary Winemaster again bragged in the press release that the Company "recorded the highest quarterly revenue in [its] history," and further noted that despite near-term headwinds in PSI's industry, "we have never been more enthusiastic about [the Company's] long-term outlook."  The same day, PSI filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2015, with the SEC reaffirming the above announced financial results and assuring that the Company's "disclosure controls and procedures were effective."

93.     On February 22, 2016, the Company issued a press release announcing its fourth quarter and full year 2015 financial results.  The Company reported net sales for the fourth quarter of $96,670,000 compared to $103,910,000 in the fourth quarter of 2014.  Despite the decrease for the quarter, the Company announced that net sales for the full year 2015 increased 12% from the previous year to $389,446,000.

94.     On February 26, 2016, PSI filed with the SEC its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 Form 10-K"), signed by Officer Defendants Gary Winemaster and Lewis, and Director Defendants Gary Winemaster, Landini, Hansen, Hoffing, and Vogt, with signed SOX certifications by defendants Gary Winemaster and Lewis.  The 2015 Form 10-K reaffirmed the above announced financial results and again reassured the market that the Company's "disclosure controls and procedures were effective."  Further, the 2015 Form 10-K again misrepresented the Company's revenue recognition policies,

again claiming that revenue was properly recorded when collectability was reasonably assured, stating:

*Revenue recognition*

We recognize revenue upon transfer of title and risk of loss to the customer, which is typically when products are shipped, provided there is persuasive evidence of an arrangement, the sales price is fixed or determinable and management believes collectability is reasonably assured. As of December 31, 2015 and 2014, we had recognized revenue associated with approximately $21.4 million and $3.2 million, respectively, of undelivered product. We anticipate the collection of any unpaid balances during 2016. We did not enter into any bill and hold arrangements during 2013.

**PSI's COO Reports Fraudulent Transactions to the Board;**
**The Board Ignores Mr. Cohen and He Is Fired**

95.     According to the Cohen Complaint filed against PSI on June 9, 2017 by Mr. Cohen (the Company's former COO), in early 2016 he became suspicious of PSI's financial situation after he was informed that the Company was experiencing both a cash shortage and dramatic revenue fluctuations.

96.     As detailed in the Cohen Complaint, in or about the first quarter of 2016, while the Company was experiencing a cash shortage and dramatic revenue fluctuations, Mr. Cohen discovered that PSI was manufacturing phony transactions to inflate revenue and sales figures, including by "pulling-forward" sales from future quarters that should not have been recognized at the time.   According to Mr. Cohen, PSI was also "manufacturing units as part of sham transactions in order to fraudulently inflate revenue and sales figures, thus misleading [the Company's] auditors, investors, regulators, analysts, and employees," and the "units from these sham transactions would either go unsold or be subject to sales terms that would generate little-to-no margin, or potentially even a loss."

97.     The Cohen Complaint also identifies numerous multimillion dollar sham transactions and accounting manipulations, including:

(a)     PSI, at the direction of defendant Gary Winemaster, improperly recognized $2.98 million in revenue on a sham transaction involving unwanted units that were never delivered to a customer, never paid for, and sat idle in a Company subsidiary parking lot;

(b)     PSI, at the direction of defendant Gary Winemaster, improperly recognized $750,000 in revenue on a sham transaction involving unwanted units for a client upon whom PSI had imposed a credit hold, which were never delivered, and instead were sent to a warehouse arranged and paid for by PSI;

(c)     PSI, at the direction of defendant Gary Winemaster, improperly recognized $10 million in revenue for sales where under a secret side-letter, the customer, which did not have a legitimate need for the engines ordered, was under no obligation to make any payments and the sale was part of a large "roundtrip" transaction under which PSI agreed to buy back from that customer generators containing the same engines that were part of the first transaction;

(d)     PSI, at the direction of defendant Gary Winemaster, improperly recognized $4.3 million in revenue for a transaction where there was another secret side-letter allowing the customer to pay only $3 million;

(e)     PSI filed a falsified white paper inflating the value of a Company subsidiary; and

(f)     PSI fraudulently grossly inflated its research and development tax credits on its federal tax filings by fabricating documents and meetings.

98.     Mr. Cohen reported his findings to defendants Gary Winemaster, Kenneth Winemaster, and Lewis, among others, in early 2016. Also among those Mr. Cohen informed of the wrongdoing was William Buzogany ("Buzogany"), PSI's Chief Legal Counsel and VP of Human Resources. Defendants Gary Winemaster and Kenneth Winemaster, Mr. Buzogany, and others all urged Mr. Cohen not to discuss these concerns.

99.     According to the Cohen Complaint, Mr. Cohen nevertheless reported these issues at the April 28, 2016 meeting of PSI's Board and Audit Committee and provided an extensive presentation to the Board and Audit Committee that detailed that the Company had been engaged in an improper revenue "pull-forward" scheme, in violation of GAAP, SEC regulations, and the Company's own stated revenue recognition policies. Rather than providing assurances that the Board and Audit Committee would investigate these issues, however, Mr. Cohen's presentation was met at the time by silence. According to the Cohen Complaint, very quickly thereafter PSI moved to retaliate against Mr. Cohen.

100.    On May 2, 2016, within five days of Mr. Cohen's report to the Board and Audit Committee, Gary Winemaster handed Mr. Cohen a specious "Action Plan" for him to "improve his performance" as an employee, saying "the Board wanted this." Throughout his entire tenure at PSI, Mr. Cohen had received only positive reviews of his performance. No issues in the Action Plan were raised at his Board presentation five days earlier. The Action Plan was purportedly dated April 27, 2016, which Mr. Cohen alleges was intentionally and deceptively backdated.

101.    On May 5, 2016, after reviewing his own notes and records, and reviewing correspondence and documents from other PSI employees, Mr. Cohen responded by letter with a point-by-point response to the Action Plan, supported by the documentary evidence he had

gathered, which also refuted the purported complaints about his job performance. The same day, Mr. Cohen advised the Board in a letter that the Company's stated financial guidance was unrealistic, and that the Company's operations were damaged "by stuffing the channel at the end of each quarter to make an artificial sales target."

102.    After requesting a response from the Board on May 12, 2016, Mr. Cohen received a letter from Mr. Buzogany calling for specific performance improvements on Friday, May 13, 2016. In a letter addressed to the Board, which he first shared with Mr. Buzogany, Mr. Cohen provided another detailed response to Mr. Buzogany's letter, concerned that the Board had wholly ignored and failed to respond to his warnings that channel-stuffing and related practices were causing great harm to PSI. Mr. Cohen's letter was ultimately delivered to the Board, but not before he was fired.

103.    On the morning of Monday, May 16, 2016, in a meeting with defendant Gary Winemaster and Mr. Buzogany, Mr. Cohen was relieved of his duties. Mr. Cohen has always asserted that he was terminated, though in this final meeting defendant Gary Winemaster sometimes used the term "resignation." Mr. Cohen's phone was seized, his computer access was terminated, and he was escorted from the building by Mr. Buzogany.

### Defendants Slowly Reveal That, Contrary to Defendants' Assurances, the Company Did Not Maintain Adequate Internal Controls

104.    On August 4, 2016, PSI postponed its second quarter earnings release and conference call, which were originally scheduled for that day, cryptically stating that the Company required the delay in order to "allow for more time to finalize its quarterly financial results" and that it would "issue a press release announcing a rescheduled date for the earnings release and conference call."

105.    Thereafter, on August 10, 2016, PSI announced that it would be filing a notice of late filing for its second quarter Form 10-Q and would no longer participate in the Jeffries 12th Annual Industrials Conference being held on August 11, 2016.  Later that day, the Company filed a Form 12b-25 stating that the Company needed "additional time to complete its financial statements" because it had "not concluded its review and analysis of transactions necessary for the closing of its books for the quarter."

106.    On August 15, 2016, PSI announced further delays to its second quarter 2016 results.  In a Form 8-K and press release, the Company admitted the reason for the delays, stating:

> The Company has not completed its financial statements in light of an ongoing review of allegations made by a former employee.  The Board and the Company take all allegations that concern its financial reporting seriously and initiated an independent review to assess whether there is any merit to them.  The review is primarily focused on certain transactions involving revenue recognition.  The Audit Committee and the professionals engaged by it to conduct the independent review are working diligently with management to conclude this review in a timely manner.  Once the independent review is complete, the Company will announce its findings and subsequently release its results for the quarter.

107.    On August 18, 2016, defendants assured stockholders that the review was proceeding with diligence, and on August 26, 2016, defendants stated that PSI expected to file its third quarter Form 10-Q in November (i.e., on time).

108.    On November 10, 2016, however, PSI filed another Form 12b-25 stating that its third quarter Form 10-Q would not be filed on time because the internal review was not yet complete.

109.    On November 17, 2016, PSI announced that it received an additional notice from NASDAQ on November 11, 2016, stating that the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1) because it did not timely file its Quarterly Report on Form

10-Q for the third quarter ended September 30, 2016, with the SEC. The announcement further revealed that on or about November 7, 2016, NASDAQ granted the Company an exception to listing rules to file its Form 10-Q for the second quarter ended June 30, 2016, on or before February 6, 2017. The announcement did not provide any indication of when the Company expected to complete its review and file its belated financial statements.

110. The above announcements sent PSI stock price on a downward spiral through the remainder of 2016. Indeed, due to the increasing uncertainty surrounding the Company's financials, PSI's stock price steadily fell from $15.96 per share on August 3, 2016, the day before the Company first announced postponement of its financials, to close the year at just $7.50 per share on December 30, 2016.

111. On January 5, 2017, the Company filed with the SEC a Current Report on Form 8-K that disclosed that on December 28, 2016, the Audit Committee, which had been overseeing the internal review of the Company's financial statements, had reached preliminary findings, and that management, in consultation with the Audit Committee and Board, had determined that PSI's financial statements for the second through fourth quarters of 2015, fiscal year 2015, and the first quarter of 2016 should would need to be restated. As disclosed in the Form 8-K, PSI had been *__operating with a "material weakness in internal controls over financial reporting"__* *__during each of the above noted periods__*, and that its previously filed financial statements for those periods "*__should no longer be relied upon__*."

112. The Form 8-K also disclosed that the restatements would focus on the timing of revenue recognition in accordance with GAAP and were expected to result in PSI restating certain revenues, expenses, and related balance sheet accounts as reported in prior periods. The Company further disclosed that the adjustments will reduce net sales recognized in the second,

third, and fourth quarters of 2015. While the Company stated it was unable, as of the filing of the Form 8-K, to quantify definitively the impact of the necessary adjustments to its prior financial statements, the errors identified based on transactions reviewed to date include at least $18 million in revenue erroneously recognized in the Company's 2015 financial statements. The Company was unable to provide assurance that additional errors would not be identified or impact prior accounting periods.

113.    In addition, the Form 8-K disclosed that the SEC's enforcement staff had informed the Company that it was investigating, among other things, PSI's revenue recognition practices.

114.    Then, on February 3, 2017, the Company filed a Form 8-K with the SEC disclosing that on January 27, 2017, RSM had resigned as PSI's independent auditor. In connection with its resignation, RSM communicated that it had identified several "reportable events" concerning the Company's financial reporting based on the information provided to RSM by the Audit Committee in connection with its "ongoing independent investigation," including that "(i) there are material weaknesses in the Company's internal control over revenue recognition and, more broadly, in its overall control environment and (ii) *RSM can no longer rely on management representations*." (emphasis added).

115.    In addition, RSM recalled its previously issued audit reports for fiscal years 2014 and 2015, and stated that its 2014 audit report and interim review of the first quarter of 2015 could no longer be relied upon. Accordingly, PSI stated that its previously issued financial statements for fiscal year 2014 and the first quarter of 2015 could no longer be relied upon and management's report on the effectiveness of disclosure controls and procedures and internal control over financial reporting also should no longer be relied upon.

116.    The Company further disclosed that on February 1, 2017, defendant Lewis agreed to take a leave of absence and relinquish his duties as PSI's CFO until further notice.  In addition, defendant Lewis submitted a letter to the Company noticing his intent to resign from the Company effective March 4, 2017, purportedly for "good reasons" under his employment agreement.

117.    On February 10, 2017, PSI disclosed that it had replaced RSM with a new independent auditor, Frazier.

118.    On March 27, 2017, PSI announced that it had entered into a series of agreements with Weichai America Corp. ("Weichai"), a subsidiary a subsidiary of Weichai Power Co., Ltd. ("Weichai Power"), a Chinese manufacturer of diesel engines, pursuant to which Weichai would make a $60 million "strategic investment" in PSI in exchange for (i) 2,728,752 shares of PSI common stock, (ii) 2,385,624 shares of a new series of preferred stock (the "Series B Stock") convertible into 4,771,248 shares of common stock, and (iii) a warrant to purchase additional common stock exercisable in 2018 so as to give Weichai a total number of shares equal to 51% of the total shares of common stock outstanding following the exercise thereof (the "Warrant").

119.    The Weichai investment closed on March 31, 2017, after which Weichai owned approximately 20% of the Company's common stock.  In connection with the Weichai investment, the Company increased the number of directors on the Board from five to seven, and on April 1, 2017 two Weichai designees—defendant Sun and defendant Kui—were appointed as directors.

120.    Pursuant to the Company's agreements with Weichai, defendant Gary Winemaster resigned as Chairman (and was replaced by defendant Sun) on April 1, 2017, and resigned from the Board entirely on April 6, 2017.  Defendant Gary Winemaster currently serves as the

Company's non-executive "Chief Strategy Officer." On August 8, 2017, defendant Gary Winemaster sold 200,000 shares of PSI common stock to Weichai for $1.9 million. As of December 5, 2017, he still owned 19.4% of the company's common stock.

121. On April 7, 2017, in another Current Report on Form 8-K filed with the SEC, PSI disclosed that the Audit Committee had "substantially completed and finalized its principal findings with respect to its review." According to the announcement, PSI's Audit Committee determined that: (i) "certain practices of the Company's sales and accounting functions resulted in revenue recognition not in accordance with generally accepted accounting principles"; (ii) "there was not an appropriate tone at the top"; (iii) "senior sales management did not sufficiently supervise sales staff"; and (iv) "management did not elevate revenue recognition practice concerns to the Audit Committee." The Form 8-K disclosed that as a result of the findings, the period of the Restatement would be expanded to include fiscal year 2014 and the first quarter of 2015 in addition to the remainder of 2015 and first quarter of 2016. The Company further estimated that the Restatement would "result in a shift of recognized revenues from prior periods to subsequent periods in the aggregate amount of approximately $48 million to $74 million."

122. The April 7, 2017 Form 8-K also indicated that the Company was in the process of implementing or had already implemented a number of recommendations made by the Audit Committee.

123. Effective May 31, 2017, defendants Hansen, Hoffing, and Vogt, all resigned from the Board purportedly due to "other personal and professional obligations."

124. On July 17, 2017, PSI was delisted from the NASDAQ exchange for failure to file with the SEC the required financial reports.

125.    On April 18, 2017, PSI stated that the Restatement was anticipated to be completed by August 2017.  This was not the case, and on August 3, 2017, PSI disclosed that the Company was continuing to review its revenue recognition for prior accounting periods and that it had "identified various material weaknesses in internal control over financial reporting that impede the Company's ability to produce reliable financial statements."

126.    In November 2017, PSI disclosed that it had identified errors relating not only to revenue recognition but also in "certain other areas."  As with the second quarter, it warned that improvements in operating results over the third quarter of 2016 would be wiped out by the costs incurred in connection with the Restatement, for which the Company "expects to continue to incur significant expenses."

127.    On November 30, 2017, PSI and Weichai entered into a securities exchange agreement pursuant to which, among other things, the Series B Stock was converted into shares of PSI common stock and certain restrictions on the exercisability of the Warrant were lifted.  As a result, Weichai now owns 40.7% of PSI's outstanding common stock, defendant Gary Winemaster owns 19.4%, and defendant Kenneth Winemaster owns 11.8%.

128.    Recently, on March 14, 2018, the Company dismissed Frazier, its barely one-year-old public accounting firm that previously replaced RSM after RSM resigned, and replaced Frazier with BDO USA, LLP.  A few days later, on March 19, 2018, the Company filed a Notification of Late Filing on Form 12b-25 with the SEC, disclosing that PSI is "unable to complete its financial statements and file its Annual Report on Form 10-K for the year ended December 31, 2017 by the prescribed due date for such filing," unhelpfully adding that the Company plans to file the Form 10-K "as soon as practicable following the completion of the restatements."

129.     To date, PSI still has not completed its restatements for the fiscal year ended December 31, 2014, the fiscal year ended December 31, 2015, the fiscal quarters within such fiscal years, and the first quarter ended March 31, 2016, and the Company has not filed Annual or Quarterly Reports on Forms 10-K or Forms 10-Q since May 2016, more than two years ago. Nor has the Company provided any estimates as to when any of these filings or restatements are likely to be completed, and there appears to be no end in sight.

## The Individual Defendants' False and Misleading Statements

130.     The Individual Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and its financial status from at least February 27, 2014 to May 10, 2016.  In particular, the Individual Defendants knowingly caused or allowed the Company to:

(a)     repeatedly assure stockholders that the Company's internal controls were adequate and effective, when the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that such information was not true; and

(b)     report quarterly and annual financial results the Individual Defendants knew, consciously disregarded, or were reckless in not knowing were materially inaccurate as a result of the Company's accounting improprieties, including its improper revenue recognition practices.

131.     The Individual Defendants knowingly caused or allowed the Company to issue the foregoing false and misleading statements in press releases, Form 10-Qs, Form 10-Ks, and other SEC filings, conference calls, and investor presentations from at least February 27, 2014 through May 10, 2016, including, without limitation, the following:

(a)     February 27, 2014 press release;

(b)      February 28, 2014 Form 10-K, which was signed by defendants Gary Winemaster, Gorey, Landini, Hansen, and Vogt and certified by defendants Gary Winemaster and Gorey;

(c)      April 1, 2014 press release;

(d)      May 8, 2014 press release;

(e)      May 9, 2014 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(f)      August 7, 2014 press release;

(g)      August 8, 2014 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(h)      November 6, 2014 press release;

(i)      November 7, 2014 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(j)      February 26, 2015 press release;

(k)      February 26, 2015 conference call;

(l)      March 13, 2015 Form 10-K, which was signed by defendants Gary Winemaster, Gorey, Hansen, Landini, and Vogt and certified by defendants Gary Winemaster and Gorey;

(m)      May 7, 2015 press release;

(n)      May 7, 2015 conference call;

(o)      May 8, 2015 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(p)      August 5, 2015 press release;

(q)     August 5, 2015 conference call;

(r)     August 7, 2015 Form 10-Q, which was signed by defendant Gorey and certified by defendants Gary Winemaster and Gorey;

(s)     October 28, 2015 press release;

(t)     November 9, 2015 press release;

(u)     November 9, 2015 conference call;

(v)     November 9, 2015 Form 10-Q, which was signed by defendant Lewis and certified by defendant Gary Winemaster and Lewis;

(w)     February 22, 2016 press release;

(x)     February 22, 2016 conference call;

(y)     February 26, 2016 Form 10-K, which was signed by defendants Gary Winemaster, Hansen, Hoffing, Landini, Lewis, and Vogt and certified by defendants Gary Winemaster and Lewis;

(z)     March 11, 2016 press release;

(aa)    May 9, 2016 press release;

(bb)    May 9, 2016 conference call; and

(cc)    May 10, 2016 Form 10-Q, which was signed by defendant Lewis and certified by defendant Gary Winemaster and Lewis.

## The Officer Defendants Received Improper Incentive Compensation Based on the Company's Overstated Financial Results

132.    Several of the Officer Defendants—defendants Gary Winemaster, Kenneth Winemaster, and Gorey—received incentive compensation based on the Company's overstated financial results, which constituted unjust enrichment of such defendants.

133.    Specifically, for 2014, the Compensation Committee awarded cash bonuses to the Officer Defendants, based at least in part on the Company's performance, as follows:

(a)    defendant Gary Winemaster received a bonus of $380,000, which comprised approximately 39.1% of his total compensation;

(b)    Kenneth Winemaster received a bonus of $170,000, which comprised approximately 35.7% of his total compensation; and

(c)    Gorey received a bonus of $200,000, which comprised approximately 41.2% of his total compensation.

134.    But for the Company's improperly overstated financial results, these Officer Defendants would not have received the amount of incentive compensation they did for 2014.

## DEFENDANTS REFUSE TO HOLD AN ANNUAL MEETING OF STOCKHOLDERS AS REQUIRED BY LAW

135.    Under section 2.2 of the Company's Amended and Restated Bylaws, "annual meetings of stockholders shall be held" each year on a date and time designated by the Board, "at which stockholders shall elect directors to hold office."

136.    In addition, Section 211 requires that an Annual Meeting of Stockholders be held within thirteen months of the previous stockholder meeting.

137.    The Company's last Annual Meeting of Stockholders occurred on April 28, 2016, more than two years ago.  The Company has not held its Annual Meeting of Stockholders for 2017 or 2018.  Thus, PSI is in open violation of its own Bylaws and Section 211.

138.    Further, Defendants' failure to hold an annual meeting has robbed the Company's stockholders of their corporate franchise at this critical juncture for PSI.  Indeed, Plaintiffs and other PSI stockholders have been unable to exercise their right to voice their frustrations at an

annual meeting and/or withhold votes for directors who have breached their fiduciary duties and harmed the Company.

## DAMAGES TO PSI

139.    As a direct and proximate result of the misconduct alleged herein, the Company has suffered tremendous harm.  As a result of the Individual Defendants' improprieties, PSI disseminated improper public statements concerning the Company's financial success, compliance with GAAP, internal controls, and business forecasts.  These improper statements have devastated PSI's credibility as reflected by the Company's more than ***$841 million***, or ***92% market capitalization loss*** from its May 2014 high to the present.

140.    PSI's performance issues have also damaged its reputation within the business community and in the capital markets.  In addition to price, PSI's current and potential customers consider a company's ability to timely file its financial results, accurately value its revenues, and evaluate its own financial results and growth.  Businesses are less likely to award contracts to companies that violate GAAP, are uncertain about their own financial conditions, and terminate whistleblowers that raise serious concerns about unsound financial conditions.  PSI's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

141.    Further, as a direct and proximate result of the Individual Defendants' actions, PSI has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from defending and paying any settlement or adverse judgement in the whistleblower action brought by Mr. Cohen;

(c)     costs incurred from investigating years of financial wrongdoing;

(d)     costs incurred from restating several years' worth of financial results; and

(e)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to PSI.

142.    In addition, the Company is now subject to an investigation by the SEC's enforcement staff and has received a subpoena requiring the production of documents and information.

143.    PSI has also received two delinquency notices from NASDAQ and has been forced to submit compliance plans and seek extensions for the filing of its financial statements in order to maintain its listing.  NASDAQ provided PSI with an extension through February 6, 2017, which the Company failed to meet, eventually forcing NASDAQ to delist the Company from the exchange on July 21, 2017.

144.    Further, the Company has been forced to amend its credit agreements with Wells Fargo at least four times (August 22, 2016, December 19, 2016, March 31, 2017, and March 29, 2018) to obtain waivers relating to the allegations made by Mr. Cohen in the Cohen Complaint and the delays in filing its second and third quarter Forms 10-Q.  Specifically, on August 22, 2016, the Company and its lenders entered into amendments that require that PSI establish a separate reserve of $12.5 million against its borrowing base ability until the filing of the second quarter Form 10-Q, at which time the reserve amount will be reduced to $7.5 million.  On December 19, 2016, PSI and its lenders entered into second amendments that eliminate the reduction of the reserve to $7.5 million upon the filing of the second quarter Form 10-Q and

-58-

make the $12.5 million reserve permanent. The second amendment with one lender also, *inter alia*, increases another specified availability reserve and requires the Company to engage a third party consulting firm to confirm various forecasts and projections for the benefit of the lenders. The third amendment on March 31, 2017 reduced the size of the revolving credit limit to $65 million and increased the interest rate by 200 basis points (2%) until the Company's restated financial are provided. It also moved up the maturity date to March 31, 2018. A fourth amendment on March 29, 2018 increased the revolving credit limit by $10 million and extended the maturity date until March 31, 2021.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

145.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by PSI as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. PSI is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiffs are stockholders of the Company, were stockholders of the Company at the time of the wrongdoing alleged herein, and have been stockholders of the Company continuously since that time.

147.    Plaintiffs will adequately and fairly represent the interests of the Company and their stockholders in enforcing and prosecuting its rights.

148.    The current Board of PSI consists of the following seven individuals: defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins, and non-defendant Huisheng Liu. As a result of the facts set forth herein, Plaintiffs did not make any demand on the Board to institute this action against the Individual Defendants.

### Demand Is Excused Because Defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins
### Face a Substantial Likelihood of Liability for Their Misconduct

149.   Such demand would be a futile and useless act because the Board was incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

150.   As alleged above, defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins breached their fiduciary duties by causing or allowing the Company by failing for almost two years and continuing to fail to ensure the Company holds an Annual Meeting of Stockholders, which is required by law and by the Company's Bylaws to be held each year.  By refusing to designate a date or time for an annual meeting of PSI stockholders, the entire Board is improperly entrenching itself and wrongfully refusing PSI's stockholders' rights to elect directors.

151.   Defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins further breached their fiduciary duties by causing or allowing the Company to continue to operate with inadequate controls, failing to ensure timely restatement of several years' worth of the Company's financial statements, and failing to ensure the timely filing of any of PSI's financial statements since May 2016.

152.   Plaintiffs have not made any demand on the other stockholders of PSI to institute this action since such a demand would be a futile and useless act for the following reasons:

(a)   PSI is a publicly held company with over 10.8 million shares outstanding as of May 5, 2016, and thousands of stockholders;

(b)   making a demand on such a number of stockholders would be impossible for Plaintiffs who have no way of finding out the names, addresses or phone numbers of stockholders; and

(c)     making demand on all stockholders would force Plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

153.    Additionally, when this action was initiated on February 10, 2017, the Board consisted of five directors:  defendants Gary Winemaster, Hansen, Hoffing, Landini, and Vogt. A majority of these directors were and are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

154.    As alleged herein, defendants Hansen, Hoffing, Landini, and Vogt, as directors; defendant Gary Winemaster, as a director and senior executive officer of the Company; and defendants Hansen, Hoffing, and Vogt, as directors and members of the Audit Committee, knowingly caused or allowed the Company to consistently misrepresent its financial results and the adequacy and effectiveness of its internal controls, and deliberately declined to ensure that the Company maintained adequate controls over its internal accounting and financial reporting functions, and therefore they each face a substantial likelihood of being held liable for their misconduct.  Accordingly, there is a reasonable doubt that directors Gary Winemaster, Hansen, Hoffing, Landini, and Vogt could have disinterestedly considered a demand to institute and vigorously prosecute this action.

155.    Defendant Gary Winemaster is directly interested in the outcome of this action as a recipient of the improperly awarded incentive compensation, as alleged herein.  Accordingly, Gary Winemaster could not disinterestedly and independent consider a demand to institute and vigorously prosecute this action.

156.    Defendant Landini has long been involved with the Company and the Winemasters.  Not only was he Vice President of Finance at Power Great Lakes, but according to the Company's public filings, Landini received a "gift" of 295 shares of PSI's preferred stock

from each of Gary and Kenneth Winemaster following the reverse merger of the W Group and Format. On November 10, 2017, PSI granted Landini 5,000 shares in a restricted stock grant that, subject to certain conditions, were scheduled to vest on July 10, 2018.

157. Defendant Landini also reaps the benefits of services his CPA and consulting firm, Landini, Reed & Dawson, P.C., provides to the Company. Since 2011, the year in which the reverse merger by which the Company became publicly traded was completed, Landini's firm has been paid a total of over $513,000 for preparation of tax returns, tax "advice" and "consultation services." Landini's firm previously provided similar services to the W Group. Upon information and belief, PSI (and previously the W Group) is an important client of Landini's small firm, which has less than ten employees, and the amounts paid by PSI to the firm are therefore material to Landini.

158. Furthermore, according to the Company's SEC filings, defendants Gary Winemaster and Landini are admittedly not independent.

## COUNT I

### Directly Against Defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins to Compel an Annual Meeting of Stockholders

159. Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

160. Pursuant to Section 211, PSI is required to hold an Annual Meeting of Stockholders at least once every thirteen months.

161. PSI last held an Annual Meeting of Stockholders on April 28, 2016.

162. Section of PSI's Amended and Restated Bylaws provides that the "[a]nnual meeting of stockholders shall be held" each year on a date and at a time designated by the Company's Board, "at which stockholders shall elect directors to hold office."

163.    In violation of the Bylaws and Delaware law, the Board has failed to designate a date or time for an Annual Meeting of Stockholders for more than two years.

164.    As a result of the Individual Defendants' wrongdoing (as detailed herein), defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins have failed to timely cause PSI to hold an Annual Meeting of Stockholders to elect directors, and there has been no action by written consent to elect PSI directors in lieu of the Annual Meeting of Stockholders required by PSI's Bylaws and Section 211.

165.    To remedy the decision by defendants Sun, Landini, Kui, Lin, Coolidge, and Simpkins to cause PSI to violate Section 211 and the Company's Bylaws, the Court should order the Board to promptly schedule, provide notice of, and hold an Annual Meeting of Stockholders.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties
### of Loyalty and Good Faith

166.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

167.    The Individual Defendants owed and owe PSI fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe PSI the highest obligation of good faith, fair dealing, loyalty, and due care.

168.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness and improper "tone at the top" within PSI, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

169.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) for years the Company was improperly recording nonmonetary revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the foregoing, several years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and financial controls were improper. The Officer Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several years' worth of the Company's financial statements, and failing to ensure the filing of any of PSI's financial statements since May 2016. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

170.    The Director Defendants, as directors of the Company, owed PSI the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the Company to violate GAAP and overstate its revenue for years. The Director Defendants knew or were reckless in not knowing that: (i) for years the Company was improperly recording nonmonetary revenue in violation of GAAP; (ii) for years the Company was overstating its revenue; (iii) for years the Company lacked adequate financial and internal controls; and (iv) as a result of the foregoing, several years of representations concerning the Company's revenue, impressive revenue growth, business prospects, and financial controls were improper. The Director Defendants further breached their fiduciary duty of candor by failing to ensure the timely restatement of several years' worth of the Company's financial statements, and failing to

ensure the filing of any of PSI's financial statements since May 2016. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

171.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PSI has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

172.     Plaintiffs, on behalf of PSI, have no adequate remedy at law.

## COUNT III

### Against the Officer Defendants for Unjust Enrichment

173.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

174.     Defendants Gary Winemaster, Kenneth Winemaster, and Gorey received improper incentive compensation based on the Company's overstated financial results, as alleged herein.

175.     It would be unconscionable and against the fundamental principles of justice, equity and good conscience for defendants Gary Winemaster, Kenneth Winemaster, and Gorey to retain the improper incentive compensation they received as a result of the Company's overstated financial results.

176.     To remedy the unjust enrichment of defendants Gary Winemaster, Kenneth Winemaster, and Gorey, the Court should order them to disgorge to the Company all compensation received as a result of the Company's overstated financial results.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

177.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

-65-

178. As a result of the Individual Defendants' wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused PSI to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

179. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

180. Plaintiffs, on behalf of PSI, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

(a)     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

(b)     Compelling the Officer Defendants to disgorge to the Company the improper compensation they received as a result of the Company's overstated financial results;

(c)     Ordering defendants to provide Plaintiffs and the Company's public stockholders accurate operating reports and financial statements for all prior quarters and years identified by the Audit Committee as inaccurate;

(d)     Ordering PSI's Board to convene and hold an Annual Meeting of Stockholders no later than sixty (60) days from the date of this Court's Order, and directing the Board to provide notice of the Annual Meeting of Stockholders consistent with the requirements of the Company's Bylaws, Section 211, and all applicable law;

(e)     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

(f)     Awarding to Plaintiffs the costs and disbursements of this action,

including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims set forth herein.

Dated: July 17, 2018

**ZIMMERMAN LAW OFFICES, P.C.**

*/s/ Thomas A. Zimmerman, Jr.*
THOMAS A. ZIMMERMAN, JR.
77 West Washington Street, Suite 1220
Chicago, IL 60602
Tel: (312) 440-0200
Fax: (312) 440-4180

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (267) 948-2512

**ANDREWS & SPRINGER LLC**
Craig J. Springer
3801 Kennett Pike
Building C, Suite 305
Wilmington, DE 19807
Tel: (302) 504-4957
Fax: (302) 397-2681

***Counsel for Plaintiff Travis Dorvit***

Dated: July 17, 2018

**ROBBINS ARROYO LLP**
BRIAN J. ROBBINS
STEPHEN J. ODDO
JENNY L. DIXON
ERIC M. CARRINO

*/s/ Stephen J. Oddo*
STEPHEN J. ODDO

600 B Street, Suite 1900
San Diego, CA 92101

Telephone: (619) 525-3990
Facsimile:  619) 525-3991
E-mail: brobbins@robbinsarroyo.com
      soddo@robbinsarroyo.com
      jdixon@robbinsarroyo.com
      ecarrino@robbinsarroyo.com

**MORRISSEY & DONAHUE, LLC**
CHARLES F. MORRISSEY
DARNELL R. DONAHUE
200 East Randolph Street, Suite 5100
Chicago, Illinois 60601
Telephone: (312) 967-1200
Facsimile: (312) 896-5959
E-mail: drd@morrisseydonahue.com
      cfm@morrisseydonahue.com
Firm No. 61390

***Counsel for Plaintiff Michael Martin***

1279250

-68-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Verified Second Amended Stockholder Direct and Derivative Complaint will be served upon all counsel of record in this action via the U.S. District Court CM/ECF System on this 17th day of July, 2018.

<i>/s/ Stephen J. Oddo</i>
STEPHEN J. ODDO